INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 11562.

United States Court of Appeals Seventh Circuit.

March 20, 1956.

Rehearing Denied April 11, 1956.

238

Harold A. Katz, Chicago, Ill., Irving M. Friedman, Jerome Schur, Katz & Friedman, Chicago, Ill., Harold A. Cranefield, Detroit, Mich., of counsel, for petitioner.

David P. Findling, Associate General Counsel, John Francis Lawless, Attorney, National Labor Relations Board, Washington, D. C., Theophil C. Kammholz, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Samuel M. Singer, Attorneys, National Labor Relations Board, Washington, D. C., for respondent.

Carl R. Miller, Decatur, Ill., Saul Cooper, Milwaukee, Wis., LeForgee, Samuels & Miller, Decatur, Ill., Seyfarth, Shaw & Fairweather, Chicago, Ill., of counsel, for intervening respondent.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO (herein referred to as petitioner or the CIO), has filed in this court a petition to review and set aside an order of the National Labor Relations Board (herein referred to as the Board or the respondent), dismissing · a complaint issued upon a charge filed by petitioner against the Borg-Warner Corporation (herein re-ferred to as the Company), following the usual proceedings under § 10(c) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., herein called the Act.[1] In the proceedings before the Board, the Company was the respondent, and Local 979 of the International Union, United Automobile Workers of America, A. F. L., herein also referred to as the AFL, intervened and appeared as a party to an allegedly unlawful contract with the Company. Marvel-Schebler Products Division, Borg-Warner Corporation intervened as respondent.

On March 11, 1954, the CIO filed a charge with the Board alleging the commission of unfair labor practices by the Company. On November 2, 1954, the general counsel of the Board issued a complaint and notice of hearing, charging the Company with violations of sections 8(a) (1) and 8(a) (2) of the Act. The CIO was named in the caption of the complaint, as was the Company, and AFL was named in the caption, as party to an allegedly illegal contract.

The complaint alleged in substance that the Company had unlawfully recognized and entered into a collective bargaining contract with the AFL as bargaining agent for the Company's employees in a new transmission plant, although at the time of the making of the contract no employees had yet been hired, and the new plant was not yet in operation. Further, it alleged that the contract unlawfully required that all new employees to be hired in the new plant become members of the AFL, and that any employees who were previously members of the AFL would be required to remain members, as a condition of employment. The complaint further charged that the Company entered into the contract with the AFL on March 16, 1954, after the Company knew that the CIO claimed to represent the Company's employees; that notice of the filing of the CIO's charge, and a direct communication from the CIO had previously been

---

1. The Board's decision and order are reported at 113 N.L.R.B. No. 18.

received by the Company. The same contract between the Company and the AFL covered employees already employed in an existing carburetor plant of the Company, and the alleged illegal provisions had been extended to cover also the employees who in the future would be hired in the new plant, and was by its terms effective for a period of two years. The complaint further alleged that the Company, by granting compulsory union membership to the AFL in this contract, along with full recognition as bargaining agent, for employees not yet hired, in a plant still under construction, interfered with, restrained and coerced its employees in the exercise of their rights under the Act, and constituted unlawful assistance to the AFL. An answer was filed by the respondents denying the commission of unfair labor practices.

Certain pertinent facts are based on stipulations entered into between the general counsel, the Company and the AFL.[2] They are summarized below.

In 1951, following a Board-conducted election, the AFL was certified by the Board to be the statutory collective bargaining representative for all production and maintenance employees at the Marvel-Schebler Division, Borg-Warner Corporation plant, Decatur, Illinois. Thereafter the Company and the AFL entered into three successive bargaining contracts which were made applicable to all of the Marvel-Schebler Division's production employees, the last of which was signed on March 16, 1954. It renewed the union-security clause. The entire contract by mutual agreement was made applicable to employees subsequently hired in a new building (called Building B) which was to house a new automatic transmission department.

The application of the collective bargaining agreement to the new department conformed with the prior practice of the Company and the AFL. Thus, when Marvel-Schebler Products Division was first established in 1950 it manufac-tured carburetors only. In October of that year a decision was made to establish a jet-engine pump department. Although actual pump production did not begin until April 1951, the collective bargaining agreement executed by the Company and the AFL in February 1951 was treated as covering employees later hired in the jet pump department. In November of that year, the Company also opened a power brake department, and the parties interpreted their contract of the preceding February as applicable to the employees hired for this department. Similarly, employees in the hydraulic pump department, first established in the summer of 1952, were deemed to be covered by the existing contract which the Company and the AFL had signed the previous February.

The transmission department in Building B is located on a tract contiguous to the land on which the other departments are located. Because of the topography of the land, fire hazards and traffic conditions the building was located 800 feet from the other existing buildings. All of the plant properties are enclosed by a common fence and there is one common entrance from the highway to the property.

By September 1954, there were about 160 employees in the transmission department of whom 101 had at one time or another worked in the old buildings. Thus, prior to March 16, 1954, when the contract in question was signed, approximately 41 employees were engaged in the old buildings in tooling up and other preparatory work in connection with transmission manufacturing. The first employees went to work in Building B on March 31, but actual production did not begin there until May of 1954. During the period from May through September 10 the Company hired 79 employees to work in the new building.

The skills employed in the making of the automotive components already in production readily lent themselves to the manufacture of the new automatic trans-

---

2. Petitioner CIO joined in only a portion of the stipulation.

missions. One man was in charge of training both groups of employees. Of the 29 jobs connected with transmission production, 21 are substantially the same as those found in the manufacture of carburetors, jet engine pumps, power brakes, or hydraulic pumps in the other departments of the plant. The remaining 8 involve operations which to varying lesser degrees are also duplicated in the older departments.

The Company's labor relations are under the direction of one man. There is one employment office through which employees for all departments are hired and one payroll section for the entire plant. All of the different products manufactured by the Company are tested in one laboratory which is now located in the new building; formerly this laboratory was in one of the original production buildings. All employees are covered by the same health and welfare program. The same medical staff renders medical care and gives physical examinations to all the employees and one nurse furnishes first aid to an employee injured in any of the departments or buildings. The same safety rules and regulations apply to all production and maintenance employees in all departments in all buildings. There is a common water supply, sewage system and electricity system for all buildings and one switchboard serves all telephones on the property. The same badge system is used to identify all employees and all of the guards are under the direction of one captain. There is one fire brigade and one fire protection system for combatting fires in any place on the company premises.[3]

By an order dated November 12, 1954, the hearing which was originally scheduled for November 22, 1954, was set down for January 4, 1955.

In an off-the-record discussion held on the first day of the hearing (January 4), the parties including the general counsel, counsel for the company, and the attorneys for the AFL and the CIO, discussed the possibility of stipulating to certain facts in lieu of adducing testimony of witnesses. According to the representative of the general counsel during these negotiations he stated that if agreement could be reached on the proposed stipulations of fact, the general counsel's case in chief would be complete and would be rested. Mr. Friedman, counsel for the CIO indicated, however, possible disagreement with some of the stipulations offered by the general counsel.

3. According to petitioner, the parts of the stipulation not joined in by CIO showed that Marvel-Schebler is an autonomous division of the Company; that the Company and AFL had negotiated most of the substantive portions of their contract on a date prior to receipt by the Company of notice of the CIO claim to represent the employees; that the Company received additional proof of the AFL's majority status among the employees before signing the new contract; that previously the Company and the AFL had blanketed in new operations under prior contracts; that the separate factory erected specifically for the new transmission department was built at a distance 800 feet from the old building because of such matters as fire hazards, the existence of a ravine, and "certain legal problems"; that the bulk of the employees in the new building, after it was staffed, were transferred from the old operation in the carburetor plant; that certain employees were doing preparatory work for the new transmission department prior to March 16; that the new plant and the old plant both used the same testing laboratory; that both plants had the same safety rules, safety equipment, and are served by the same medical staff; that both plants are in a single enclosed area, using the same guard force, and the same water, electrical and telephone systems; that there was a common employee badge system, health and welfare program, credit union, social and athletic program, training program and payroll department; that labor relations of both plants were under Andrix; that on twenty-one of the jobs in the two plants, the job classifications, skills and operations were substantially similar, while eight classifications were found exclusively in the transmission department, and twenty-one classifications were found exclusively in the old carburetor plant; and that there was some interchange of employees and of some work between the two plants.

At the hearing held the next morning (January 5), the general counsel offered in evidence a series of stipulations signed by counsel for the Company and the AFL. Counsel for the CIO agreed to only parts thereof. (ante, 2) Following receipt of all of the stipulations in evidence, the general counsel rested his case.

The trial examiner then called upon the CIO to state what it proposed to offer at the hearing. Friedman, its counsel, asked counsel for the Company to produce Company vice president Andrix, for questioning. When Company counsel replied that he was not certain as to Andrix's availability, Friedman stated that he proposed to call him "as a witness for adverse examination," explaining, "I propose to examine Mr. Andrix briefly * * * with that, we will rest".

Following the noon recess the hearing was reopened and the CIO introduced into the record certain documentary evidence. Thereafter, when it was discovered that Andrix was not available as a witness because he had left town earlier in the morning to attend a meeting of Company officials, Friedman moved to recess the hearing until the following morning in order to give him "an opportunity to obtain and attempt to serve a subpoena on Mr. Andrix". Counsel for both the Company and the AFL opposed the motion for lack of diligence in failing to subpoena Andrix earlier. Counsel pointed out that Andrix could have been subpoenaed the day before or earlier in the morning when Andrix had been present at the hearing at which time "counsel for the Charging Party knew * * * that he would be adverse to entering into a stipulation

that the remaining counsel were contemplating entering into". In addition, counsel for the AFL explained that a postponement would preclude his appearance in a federal district court with reference to an urgent matter.

The trial examiner recessed the hearing for approximately two hours to permit the CIO to serve a subpoena on Andrix.

When the hearing reconvened, Friedman reported that service of the subpoena had not been made on Andrix; that service of subpoenas had been attempted on two other supervisors but only one of them, described by Friedman as plant superintendent Carter, was served;[4] and that Carter had not appeared in response to the subpoena. Mr. Friedman then requested an adjournment in order to seek enforcement in the courts of the subpoena issued to Carter.[5] At no time did Friedman state that the facts stipulated were incorrect; nor did he make any attempt to independently establish that the facts were other than as set forth in the stipulation. The trial examiner, after hearing statements of opposition from all of the parties in the case and after noting that "the CIO had made no effort to subpoena any of [the witnesses whose testimony it desired] in the 2-month period that elapsed between the issuance of the complaint and the opening of the hearing and upon consideration of the additional fact that counsel conceded that he had not even talked with any of the individuals concerned so it was apparent he had no knowledge of what testimony they might give when called to the stand as adverse witnesses," denied the motion for a continuance. Thereafter Friedman, in support of his motion for a continuance,

---

4. In the record is Carter's statement under oath that on January 5, 1955 he was the superintendent of the transmission department of the Marvel-Schebler Products Division of the Company.

5. In support of this request Friedman stated that the charging party desired "additional evidence * * * [to] strengthen the case presented by the General Counsel on behalf of the Government"; that the charging party "had no opportunity to cross examine and show bad faith, if bad faith there be, in the commission of certain acts on the part of company officials"; and that "due process" required that the CIO be afforded a reasonable opportunity during which it could compel the appearance of Carter for examination as an adverse witness.

proposed to make an offer of proof concerning the evidence he intended "to introduce into the record through the calling of the witness [Carter] who has not appeared" in response to the subpoena. The trial examiner rejected the offer, pointing out that in view of counsel's admitted failure to interview or speak to the witness previously, "any statement as to what counsel might expect to prove * * * could not be any more than a fervent hope * * * as to what one might be able to prove".

In its final decision and order the Board affirmed the aforesaid trial examiner's rulings.

1. Presented to us is a procedural issue: whether the trial examiner denied CIO a fair hearing because (a) the examiner received in evidence a stipulation entered into between the general counsel and the adverse parties, despite CIO's refusal to join in all portions of the stipulation, (b) the trial examiner rejected CIO's request for a continuance of the hearing to call an official of the Company for the purpose of examination, and (c) the examiner refused to permit CIO to make an offer of proof.

■ (a). CIO is the charging party. The charging party in a labor case is something like a complaining witness in a criminal case. But he is much more than that, for a complaining witness is not entitled to appeal even where an appeal is allowed for the prosecution in a criminal case. On the other hand, the charging party is not like the ordinary plaintiff in a lawsuit, who does not have to have anybody's permission to go ahead with his action if he can pay the required fees. This is something in between. After complaint is issued, the charging party does have some standing. Once the Board files a complaint on the charge

presented, the charging party is entitled to have a chance to be heard. He has a right to object if after hearing he does not like the result. But he has nothing on which to base his objections unless there is a hearing and a record is made so that the court has something to go on. Marine Engineers' Beneficial Ass'n No. 13 v. National Labor Rel. Bd., 3 Cir., 202 F.2d 546, at page 549.

■■ The act[6] vests in the general counsel of the Board authority in respect of the prosecution of complaints such as that involved in this case. As such prosecutor, he had power to enter into the stipulation received in evidence, without the concurrence of the CIO, the charging party.

■ We hold that the receipt in evidence of the stipulation did not deprive CIO of a fair hearing. To the extent that it did not join in the stipulation, it was entitled to submit evidence to contradict or explain the parts thereof in which it did not join.

■ (b). We have stated in detail the circumstances existing up to the time that the trial examiner rejected CIO's request for continuance of the hearing. The examiner's general attitude toward CIO's counsel was fair and friendly; in fact, he ruled favorably to CIO upon the merits of the controversy. In our opinion, he was justified in refusing a continuance.

■ (c). In view of the fact that CIO's counsel stated that he wanted to call Carter, the Company's department superintendent, for *adverse* examination, and that there is no showing that said counsel had talked to Carter or in any other way knew what Carter would say if he testified, the attempt of said counsel to make an offer of what he would

---

6. 29 U.S.C.A. § 153(d). The 1947 legislative history of said section includes a statement by the conference committee which reads: "The conference agreement * * * does provide that there shall be a General Counsel of the Board, who is to be appointed by the President by and with the advice and consent of the Senate, for a term of four years. * * * By this provision responsibility for what takes place in the Board's regional offices is centralized in one individual who is ultimately responsible to the President and Congress." 93 Cong. Rec., Part 5, page 6371.

prove by Carter, if present as a witness, lacked substance and no doubt was considered by the examiner as a mere maneuver, which justified the refusal to permit the offer to be made. The examiner acted correctly in this respect.

■ 2. The Board held [7] that, in view of the similarity of skills and manufacturing processes required throughout employer's operations, and the centralized control of labor relations and hiring, uniformity of wages, hours, and working conditions, the fact that the new department was staffed with a substantial number of transferees from employer's other operations, and the proximity of the new building to the other buildings within the same fenced area, the newly hired employees of the transmission department constituted an accretion to the existing production and maintenance unit. It also held that, as an accretion to an existing unit, these employees would not, under established Board policy, have been accorded a self-determination election. Accordingly, employer's extension of its union security contract with the AFL to those employees in the circumstances of this case did not violate sections 8(a) (1) or 8(a) (2) of the Act.

We cannot say that there is no substantial evidence to support its findings or that its decision is not conclusive. Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, at page 491, 67 S.Ct. 789, 91 L.Ed. 1040.

■ Primarily the question of the number and bases of bargaining units is for the Board whose experience entitles its judgment to almost complete finality. Unless its action is "arbitrary or capricious", we must, and will, accept it. Marshall Field & Co. v. National Labor Relations Board, 7 Cir., 135 F.2d 391, at page 394. As we said in National Labor Relations Board v. Esquire, Inc., 7 Cir., 222 F.2d 253, the question for us is whether or not the Board abused its discretion by acting without rational cause or from improper motives.

We hold that in this case the Board did not abuse its discretion, or act arbitrarily or capriciously or without rational cause or from improper motives.

For the reasons hereinbefore set forth, the petition is

Denied.

**7.** 5 Labor Law Reporter, 4th Edition, C.C.H. ¶ 53,056; 113 N.L.R.B. No. 18.