NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

PLANKINTON PACKING COMPANY, a Division of Swift & Company, Respondent.

No. 12419.

United States Court of Appeals
Seventh Circuit.

April 16, 1959.

Thomas J. McDermott, Associate Gen. Counsel, Nancy M. Sherman, Atty.,

Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Atty., N.L.R.B., for petitioner.

Donald H. Bussman, Arthur C. O'Meara, George V. Gallagher, Chicago, Ill., for respondent.

Before MAJOR, SCHNACKENBERG, and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

This matter came before us on petition of the National Labor Relations Board (hereinafter called the "Board") under Section 10(e) of the National Labor Relations Act, as amended, (29 U.S.C.A. § 151 et seq.) for enforcement of its Order of May 20, 1958.

The Order was based on the Board's decision that respondent, (hereinafter called "Plankinton") had violated Secs. 8(a) (1) and 8(a) (5) of the Act.[1]

The situation which led to the Board's Order arose as follows: A Board-directed election in a group of clerical employees at Plankinton resulted in certification of Office Employees International Union, Local No. 9, AFL–CIO (hereinafter called the "Union") as bargaining representative. Plankinton's position is that this group, comprising both office and plant clerical employees, was not an appropriate bargaining unit within the meaning of the Act.

Plankinton argues further that the Consolidated Complaint was prematurely issued prior to completion of the requisite investigation, as Plankinton was still in process of supplying information requested by the Board's field examiner.

The Board's position with reference to the pending investigation is that Plankinton was not prejudiced as Plankinton's attack on the Complaint on this ground went solely to paragraph eight, later dismissed, which alleged the discriminatory discharge of Thomas Edmund Powers, and that Section 10(e) of

---

[1] "Sec. 8(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. * * * (5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."

the Act limits review to questions timely raised before the Board.

The primary issue in this case is whether Plankinton has refused to bargain in violation of the Act. To decide this issue, we must first consider whether the Board has acted arbitrarily or capriciously in dividing certain employees between "office clerical" and "plant clerical" bargaining units.

The facts with respect to unit determination were not the subject of investigation at the time Complaint issued and are largely undisputed. We, therefore, find no merit in Plankinton's argument that the entire case must be dismissed for failure to follow proper investigative procedure.

■ This Court will accept the unit determination of the Board unless review of the entire record shows that the Board has acted arbitrarily or without rational cause. N.L.R.B. v. Esquire, Inc., 7 Cir., 1955, 222 F.2d 253. International Union etc. v. N.L.R.B., 7 Cir., 1956, 231 F.2d 237, cert. den. 352 U.S. 908.

As indicated in Esquire, each case must turn on its own facts rather than on general rules. So many factors can influence the choice that it is impossible to formulate rigid rules applicable in all situations.

In the case before us, the Union had originally sought to represent all clerical employees. The Board found differences in location of work, supervision, hours of work, payroll, dressing rooms, time keeping, and company representation for bargaining, and concluded that community of interest did not exist between plant and office clerical employees. The Board, therefore, designated two units—plant clerical and office clerical.

The plant clerical unit voted against the Union. The office clerical unit voted in favor of the Union by a vote of 32 to 28. Exclusion of clerical employees in the Time and Employment Office and the Standards Department, or inclusion of the weight takers and the office janitor, for which Plankinton contends, might have produced a different outcome.

The Board, as indicated above, found Plankinton's operations to be divided into two parts: the General Office (supervised by the Auditor-Office Manager) and the Plant (supervised by the Plant Superintendent). If employees in the General Office were to be represented by a union, Plankinton's representative in any bargaining session would be the Auditor-Office Manager. If the employees in the Plant were to be so represented, Plankinton's representative would be the Plant Superintendent.

The Time and Employment Office clerks figure the payroll; maintain records and seniority lists; and urge participation in benefit plans; (for hourly paid production and maintenance employees working in the plant), and prepare reports for the Plant Superintendent. The General Office does its own record keeping and hiring. The Standards Department clerks provide management with figures for control of production costs and labor, and apply standardized time limits to the production of the hourly paid plant employees to compute possible payment of incentive earnings.

Adopting the Board's own theory of what constituted relevant differences in this operation, Plankinton argues that the 15 clerical employees in both the Time and Employment Office and the Standards Department work in places separated from the General Office; are supervised by the Plant Superintendent; work irregular hours, not having regular starting and quitting times as do the office clerical employees; are carried on the plant payroll unlike office clerical employees, who are carried on the office payroll; have a different pay day from the office clerical employees; use dressing rooms not shared with office clerical employees; and, if represented by a union in a bargaining session, would be dealing with the Plant Superintendent as Plankinton's representative, not the Auditor-Office Manager.

The weight takers (student buyers, three or four in number) work with Plankinton's buyers, not in Plankinton's own stockyards, but in the public yards,

geographically removed from Plankinton's premises. They have a closer association with the General Office than with the plant clerical employees. They are supervised by the General Office and handle clerical work for the buyers. Plankinton contends that in White Provision Company, 1956, 116 N.L.R.B. 1552, employees of similar function were found to be office clerical employees.

■ Although the Board in its decisions frequently does refer to customary practices and will sometimes cite cases, as the Court noted in Esquire, the Board has not established fixed and rigid standards for guidance in its determination of bargaining units. We cannot infer inclusive and indispensable criteria from mere analysis of past determinations made by the Board. The Board argues that the clerical duties performed by the weight takers, whose background is agricultural, are merely incidental to their primary task of learning to be buyers; that, unlike the office clerical employees, they work away from the offices, and have no fixed hours. The Board concludes that the single circumstance that the weight takers are under the jurisdiction of the Office Manager, rather than that of the Plant Superintendent, might perhaps justify including them in the office unit, but does not require such inclusion. It is our conclusion that these employees are not properly considered clerical employees.

However, we are left with an inherent inconsistency in the Board's Decision itself. The Board does not always place office and plant clerical employees in separate bargaining units (F. H. McGraw & Co., 1953, 106 N.L.R.B. 624, 628), although the Decision refers to "customary policies of refusing to establish single units comprising both office clericals and plant clerical employees, * * *"

The office janitor's duties are concerned with those of the office clerical employees, and he is supervised by the Auditor-Office Manager. The Board left the question of the janitor undetermined. His vote alone would not have affected the results of the election. However, the Board does not contest Plankinton's contention that the office janitor should be part of the office clerical unit.

Alleged violation of Section 8(a) (1) is based on three specific conversations between Thomas Edmund Powers, who was formerly employed as a timekeeper and payroll clerk, and Harry R. Lavey, the Plant Superintendent, who was a personal friend. Powers in his testimony before the Board, quoted Lavey as saying that because of Powers' education, ability and past performance, the Union would do him no good as he would be "bracketed" or classified as to a pay grade with people who could not carry their own weight; that benefits enjoyed by employees represented by a union at International Harvester compared unfavorably with those at Plankinton. Lavey, Powers further testified, was surprised when Powers became a member of the committee to attend the N.L.R.B. hearing because Powers was such "a friend and a buddy" of his in hunting and fishing, and, further, warned Powers that Plankinton was not seeking union-minded people for managerial positions for fear of divided loyalties. Powers also testified that Lavey urged him repeatedly to go into the sales end of Plankinton, but that he was not interested; that Lavey spoke of recommending Powers for the job of assistant purchasing agent, for which Powers had been passed over because of union activity, and informed Powers that reduction in staff would shortly terminate Powers' employment. He also said that Lavey asked his cooperation to prevent defacing of the sample ballot in the Board's posted notice of election, and later cautioned him not to "go around talking about the union so much" if he wanted a recommendation from Plankinton. He added that this caution was occasioned by a remark he had made which was misinterpreted and misreported to Lavey, to whom he subsequently apologized.

Lavey himself testified that because of the economic drive to reduce overhead expense, and Powers' position as the

642

youngest full-time office employee in the Time Office, he had repeatedly tried in vain to interest Powers in the sales organization of the company. He said that he had recommended Powers to the head of the purchasing department, who eventually chose as his assistant to fill the vacancy, a man already in the sales organization; that Lavey did not know whether Powers' union activity affected the choice and had never said it did. He had told Powers he would be laid off, effective the week ending March 23, and again tried, without success, to interest him in a sales job.

The Board found that Lavey told "Powers shortly before October 30, 1956, that continued union activity would do him no good and would therefore be harmful to him." On this point, Powers testified variously that he had met with Lavey " * * * before the election, which I would recollect was the end of September * * *," " * * * prior to the election by one or two weeks," and " * * * about two or three days prior to the election itself." He said he was called in to help stop defacing of the sample ballot posted with notice of the election. When Mr. Haas, appearing on behalf of the N.L.R.B., asked if the Union has been specifically mentioned, Powers testified that " * * * the Union was always mentioned." His testimony earlier, in detail, regarding conversations with Lavey prior to September 28, 1956, was admitted in evidence as background only. Section 10 (b) of the Act prohibits predicating a complaint of unfair practice on conduct occurring more than six months prior to the filing of the charge,—March 27, 1957, in this case.

In any event, Powers evidently understood that Lavey was making no threats, but merely expressing a personal opinion that unionized employees tended to be paid a common wage level applicable to all within the same classification. Powers himself testified that he argued the point with Lavey, observing that the last five foremen hired had been union employees.

The Board's finding of discrimination against Powers for a sales position because of his union activity is based on a comment allegedly made by Lavey to Powers in February. This comment, quoted by Powers, is at sharp variance with the rest of Powers' own testimony to the effect that he continually expressed disinterest in any sales position despite Lavey's repeated advice to make application for employment in the sales organization. Powers said that he knew nothing of the opening beyond the comment made by Lavey. Lavey testified that he did not know whether Powers' union activity had anything to do with his failure to get the job, that the head of the Department was looking for a helper, and Lavey had suggested Powers, but that a man from the sales organization had been chosen.

It would appear, at least, equally reasonable to conclude that Powers' own repeated expressions of disinterest militated against his being chosen to fill the opening over a man who was already employed in that department.

The last incident arose out of a remark made by Powers. He testified that on March 20th, when the business representative of the Union was expected, he had said, "There is going to be fur flying down here," that the remark was "twisted around" and the "original meaning was lost," and that for that reason Powers thought Lavey was entitled to an apology. The testimony viewed as a whole offers no substantial support for a finding of coercion, restraint or interference.

We conclude that the Board's bargaining unit determination was arbitrary with respect to including the Time and Employment Office and Standard Department clerical employees in the office clerical unit. Therefore, the Board erred in requiring Plankinton to bargain with respect to that unit.

We hold that the Board's findings that Plankinton violated Sections 8(a) (1) and 8(a) (5) of the Act are unsupported by substantial evidence. Petition for enforcement of its Order must

therefore be denied, and the Order set aside.

Our decision renders moot Plankinton's motion for remand to the Board to take additional evidence regarding allegedly inconsistent Board unit determination in a later representation case involving Swift and Company's Fort Worth Plant.