495 F.2d 1195
 85 L.R.R.M. (BNA) 2668, 73 Lab.Cas. P 14,377
 LIBBEY-OWENS-FORD COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, United Glass and
Ceramic Workers of North America, AFL-CIO-CLC and
its Locals Nos. 1, 5, 9, 19, 33 and 418,
Intervenor.
 No. 73-1515.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 17, 1973.
Decided March 8, 1974
Rehearing Denied June 13, 1974.
 
 Nicholas Unkovic, Leonard L. Scheinholtz, and William D. Armour, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., and Edward E. Hiett, Toledo, Ohio, for petitioner.
 Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert A. Giannasi, Asst. Gen. Counsel, and Fredric Sagan, Counsel, NLRB, Washington D.C., for respondent.
 Emil Oxfeld and Abraham L. Friedman, Rothbard, Harris & Oxfeld, Newark, N.J., and David Clayman, Columbus, Ohio, for intervenor.
 Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This case is before this court upon the petition of Libbey-Owens-Ford Company (hereinafter the 'Company') to review and set aside a Supplemental Decision and Order of the National Labor Relations Board issued on March 1, 1973, and reported at 202 N.L.R.B. No. 15. The Board has made a cross-application for enforcement of that order. This court has jurisdiction over these proceedings by virtue of Section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. 160(f).
 
 
 2
 The Company, an Ohio corporation, with its main offices in Toledo, Ohio, is engaged in the manufacture and sale of glass and glass products. On January 30, 1939, the Board certified the United Glass and Ceramic Workers of North America, AFL-CIO-CLC (hereinafter the 'Union'), as the collective bargaining representative in a single bargaining unit consisting of the Company's production and maintenance employees at eight plants located in Ottawa, Illinois, Charleston and Parkersburg, West Virginia, Rossford and Toledo, Ohio, and Shreveport, Louisiana. Libbey-Owens-Ford Glass Company, 10 N.L.R.B. 1470 (1939).[1] The Company and Union have maintained a continuing bargaining relationship since the certification. Subsequently the Company recognized the Union as the collective bargaining representative also for the production and maintenance employees at two other plants, each of which was recognized as a separate unit with a separate bargaining agreement. One plant, located in Brackenridge, Pennsylvania, was recognized by the Company in 1943, after being acquired by purchase; the second plant, located in Lathrop, California, was recognized in 1962, shortly after it was constructed by the Company.
 
 
 3
 On July 13, 1966, the Union filed a unit clarification petition (6-UC-4) to clarify the existing multi-plant unit by including the represented employees in the single plant units at Brackenridge and Lathrop. Following a hearing on the petition, the Board issued a Decision and Direction of Election on January 12, 1968, in which it found that the existing separate units and an enlarged multiplant unit were both appropriate and therefore ordered separate self-determination elections at the Lathrop and Brackenridge plants to permit the employees in the affected single-plant units to determine whether or not they were to be included in the larger, multi-plant unit. 169 N.L.R.B. 126 (1968). Board members Fanning and Jenkins dissented, being of the opinion that the Board lacked statutory authority to hold elections to determine the unit placement of represented employees.
 
 
 4
 The Company and the Union, in the interim, continued to bargain for the Lathrop plant as a separate unit until the multi-plant negotiations in October 1968. At that time, the Union demanded that the Brackenridge plant, the Lathrop plant, and a new plant at Mason City, Iowa, be included in the multiplant unit. The Company steadfastly refused to include Brackenridge or Mason City but did include Lathrop in the multi-plant unit.
 
 
 5
 On December 10, 1968, following the directed elections held on March 20, 1968, the Board issued a Supplemental Decision and Order, in which it found that a majority of the employees in each of the two separate plant units had voted in favor of merger with the multiplant unit and ordered that the multiplant unit be clarified by including the Brackenridge and Lathrop plants. 173 N.L.R.B. 1231 (1968). Members Fanning and Jenkins dissented on the basis of their earlier opinion that this election should not have been held.
 
 
 6
 When the Brackenridge contract expired on September 30, 1969, the Company refused to add the Brackenridge plant as a part of the multi-plant unit and refused the Union's demands that the provisions of the multi-plant contract be made applicable to Brackenridge employees. The Union filed an unfair labor practice charge against the Company on October 13, 1969 (6-CA-4771), alleging that the Company had violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the Union on behalf of the Brackenridge employees as part of the Board-clarified multi-plant unit. Thereafter an unfair labor practice complaint issued and a hearing was held.[2] In his decision, issued on July 29, 1970, the Administrative Law Judge held that he was bound by the Board's prior decision in the unit clarification case and that the Company had, therefore, committed an unfair labor practice by refusing to recognize and bargain with the Union as the duly certified representative of the Brackenridge employees as part of the multi-plant unit.
 
 
 7
 On April 16, 1971, the Board (with members Brown and Kennedy dissenting) issued its Decision and Order dismissing the complaint. 189 N.L.R.B. 871 (1971). Members Fanning and Jenkins based their decision to dismiss on their previously stated view that the Board did not possess statutory authority to determine unit placement of represented employees by conducting elections to clarify existing bargaining units. Chairman Miller concurred in dismissing the complaint, not because of any lack of statutory authority, but because 'the Board has consistently refused since 1968 to follow and apply the Libbey-Owens-Ford doctrine, even in cases which were virtually indistinguishable,' and because the Board's 'duty to foster stable collective-bargaining relationships is well discharged by leaving the matter of changes in size of a multiplant bargaining unit to be worked out by agreement of the parties.' Members Brown and Kennedy, in separate dissents, indicated that they viewed the underlying certification to be a proper exercise of the Board's authority, that the Company was under a duty to honor that certification, and that its failure to do so constituted a violation of its duty to bargain imposed by Section 8(a)(5) and (1) of the Act.
 
 
 8
 Thereafter, the Union filed a petition to review and set aside the Board's decision with this court. On June 21, 1972, we issued our decision remanding the proceedings to the Board for further consideration. United Glass and Ceramic Workers of North America v. N.L.R.B., 463 F.2d 31 (3d Cir. 1972). We held that the Board acted within its statutory authority in conducting a unit clarification proceeding designed to consider the merger of existing collective bargaining units and that the Board had the requisite authority to conduct the elections at the Brackenridge and Lathrop plants. We noted, however, that because of their respective views of the case, neither members Fanning and Jenkins nor Chairman Miller had passed on the appropriateness of both a multi-plant unit including the Brackenridge plant and of the Brackenridge single-plant unit. Accordingly, the case was remanded to the Board to make such a determination, unless a majority of the Board adheres to the view advanced by Chairman Miller that the determination of the unit should be left to collective bargaining or decides not to proceed with the case for other reasons.
 
 
 9
 On March 1, 1973, the Board (with Chairman Miller dissenting) issued its Supplemental Decision and Order, in which it reaffirmed its view that the single-plant and multi-plant units constituted equally appropriate units for bargaining for the reasons stated in the initial unit clarification decision. Thus, the Board found that the Company was obligated to bargain with the Union as the exclusive bargaining representative of its employees in the clarified multiplant unit, and that by refusing to bargain with the Union on behalf of its Brackenridge employees as part of such unit, the Company violated Section 8(a)(5) and (1) of the Act. On April 9, 1973, the Company filed a motion for reconsideration of the Board's Supplemental Decision and Order, which the Board denied in an order dated May 18, 1973.
 
 
 10
 The only issue raised by the Company's petition to review and set aside the Board's Supplemental Decision and Order of March 1, 1973, is whether the Board's underlying unit determination was erroneous. In reviewing that determination, this court is mindful of the fact that the Board is granted broad powers under Section 9(b) of the Act to determine appropriate bargaining units.[3] Thus, the Supreme Court has declared that such a determination 'involves of necessity a large measure of informed discretion, and the decision of the Board, if not final is rarely to be disturbed.' Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). See also N.L.R.B. v. New Enterprise Stone & Lime Co., 413 F.2d 117, 119 (3d Cir. 1969); N.L.R.B. v. David Friedland Painting Co., 377 F.2d 983, 987 (3d Cir. 1967). Nevertheless, as the Supreme Court also observed in Packard Motor Car, supra, a determination of a unit of representation may be so unreasonable and arbitrary as to exceed the Board's power.
 
 I.
 
 11
 The Company challenges the Board's unit determination on two grounds. First, it argues that the Board's finding in the unit clarification proceeding, that a multi-plant bargaining unit which included the Brackenridge plant is appropriate, is not supported by substantial evidence on the record as a whole.[4] The Company contends that the record in this case fails to establish, and indeed demonstrates the absence of, a number of factors generally considered relevant to the issue of the appropriateness of a multi-plant unit.[5] Although this contention appears correct as to the absence of some of these factors, it nevertheless does not preclude the Board from finding that the inclusion of the Brackenridge plant in the unit is appropriate. In determining whether certain employees should be grouped together for collective bargaining, the Board is free to consider a wide variety of factors, and the presence or absence of one or even several of them is not necessarily determinative of the case. See Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 156, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).[6] As the Supreme Court pointed out in N.L.R.B. v. Jones & Laughlin Steel Corp., 331 U.S. 416, 422-423, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), the Board's unit determinations 'are binding upon reviewing courts if grounded in reasonableness,' which 'necessarily implies that the Board has given due consideration to all relevant factors and that it has correlated the policies of the Act with whatever public or private interests may allegedly or actually be in conflict.'
 
 
 12
 In Its July 12, 1968, decision, the Board based its determination that an enlarged multi-plant unit was appropriate primarily on two factors: first, that the history of bargaining between the Company and the Union demonstrates a pattern of successful bargaining in a unit of widely scattered plants which are not functionally or operationally integrated, and, second, that the Brackenridge and Lathrop plants do not differ significantly from those plants which, over the years, have been successfully integrated into a single, multi-plant unit. 169 N.L.R.B. 126, 127-28. We believe that such reasoning shows a careful consideration by the Board of all the relevant factors and serves the purpose of assuring that the unit in question will be a viable bargaining unit. The only remaining question, therefore, is whether the two elements relied on by the Board are supported by substantial evidence in the record.
 
 
 13
 The existence of a pattern of successful bargaining in an expanding multiplant unit is not disputed. The record reveals that for the past 40 years the Company and the Union have been bargaining on a multi-plant basis, and during that period the unit has been enlarged as the Company has acquired new plants. Thus, the unit found appropriate by the Board was virtually employer-wide-- encompassing all but two of the Company's plants then in existence.[7] It is true, as the Company observes, that there is also a history of successful bargaining between the Company and the Union in the single-plant unit at Brackenridge. However, that fact alone does not conflict with the Board's finding that the inclusion of Brackenridge in the multi-plant unit would also be appropriate, for there is no reason to infer that a history of successful bargaining within a single-plant unit would interfere with successful bargaining by the same parties on a broader basis.[8]
 
 
 14
 The Company does dispute, however, the Board's finding that Brackenridge does not differ significantly from the other plants in the multi-plant unit. That finding was based on an examination of three factors-- location, plant integration, and similarity of operations. After a careful review of the record, we hold that the Board's conclusion as to each of these factors is supported by substantial evidence. First, the testimony of Melvin B. Burwell, Vice President, Employee Relations, of Libbey-Owens-Ford Glass Company, supports the Board's finding that the then-existing eight-plant unit 'encompassed plants which are between 4 and 986 miles from the Employer's home office in Toledo, Ohio, and hence is not based on any geographical considerations, while the Brackenridge and Lathrop plants are 240 and 2,367 miles from Toledo, respectively.' 169 N.L.R.B. 126, 128. Second, in light of the evidence demonstrating the operational independence of the plants within the multi-plant unit, the Board could reasonably conclude that 'there is generally no greater functional or operational integration between the plants in the multiplant unit than between either of the two disputed plants and the others.' Id. Third, the testimony of Mr. Burwell also supports the Board's finding that of the eight plants in the multi-plant unit, 'five produce raw plate glass and fabricate it, while the other three (like Brackenridge) are engaged solely in fabrication,' and that 'all the plants involved are engaged in essentially the same basic operations in that all are producing and fabricating glass and/or glass products.' Id. at 127.
 
 
 15
 The Company challenges this last finding by pointing out that Brackenridge no longer produces any products which are typically multi-plant operations[9] and that, as the Board noted, Brackenridge is the only plant which fabricates filmed surface glass products and mirrors. This operation includes both conventional silvering of glass by mechanical deposition and the more complex application of metallic films by thermal evaporation in a vacuum. Thus, the Company argues, the skills and functions of employees in the Brackenridge plant are not similar to those in a window glass, plate glass, or float glass plant. However, in view of our approval of the Board's approach to the unit determination in this case, the issue is not whether the skills involved at Brackenridge differ from those found elsewhere in the multi-plant unit, but whether such difference is greater than that found among the other plants. Since the unit includes plants using a wide variety of techniques for producing and fabricating glass and requiring differing levels of skill and organization, the Board could reasonably infer that the inclusion of Brackenridge's employees would not introduce a significant new element of diversity.
 
 II.
 
 16
 Second, the Company also argues that the Board's unit determination in this case is arbitrary, discriminatory and inconsistent with Board policy applied in other cases. See Hotel Employees v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958); Office Employees International Union v. N.L.R.B., 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957); N.L.R.B. v. Pittsburgh Plate Glass Co., 270 F.2d 167 (4th Cir. 1959), cert. denied, 361 U.S. 943, 80 S.Ct. 407, 4 L.Ed.2d 363 (1960). The Company points out that in every decision subsequent to the unit clarification in this case, the Board has dismissed unit clarifications seeking mergers into larger units. Rohm & Haas Co., 183 N.L.R.B. No. 20 (1970); Cities Service Oil Co., 182 N.L.R.B. 12 (1970); PPG Industries, Inc., 180 N.L.R.B. 477 (1969).[10] Nevertheless, this difference in result does not constitute an arbitrary discrimination against Libbey-Owens-Ford Company. Rohm & Haas and PPG Industries involved companies in the same industry as the Company here, and the facts of those cases closely resumble those in the instant case. However, in both cases, members Jenkins and Fanning voted to dismiss on the grounds rejected by this court here, namely, that the Board lacked statutory authority to merge units, while a single member, member Zagoria, in PPG Industries and Chairman McCulloch in Rohm & Haas, respectively regarded the instant case as distinguishable because the unit here was virtually employer-wide and was based on a substantial history of multiplant bargaining. Since those cases were not appealed, the issue of appropriateness was not determined by a Board majority in either case, and thus the difference in result between those cases and this one is not attributable to a discriminatory application of Board policy. Cities Service, on the other hand, is distinguishable from the instant case in that the union there did not represent all the employer's plants, but rather was seeking to merge three unrepresented plants with an existing multi-plant unit, and the proposed multi-plant unit was considerably less than employer-wide, since 12 plants would have remained unrepresented.
 
 
 17
 Finally, the Company contends that the Board's unit determination in this case is inconsistent with the goal of stabilizing industrial relations, see Kalamazoo Paper Box Corp., 136 N.L.R.B. 134, 137 (1962), for the Union's constitution and by-laws require the unanimous vote of all members of the wage committee to accept a contract, and thus as a member of that committee Brackenridge could prevent the consummation of a multi-plant agreement. To the extent that one important purpose of a unit determination is to foster efficient and stable collective bargaining, that end is accomplished where, as here, the Board correctly finds that a sufficient community of interest exists among the workers in the proposed unit to ensure that such unit will be viable for bargaining purposes. The fact that inclusion in the multi-plant unit may increase the bargaining power of the Brackenridge employees should not serve as a basis for exclusion.
 
 III.
 
 18
 The dissenting opinion contends that because the Board has found that the combination of pre-existing units is an appropriate bargaining unit, the unit determination in this case should be subjected to special scrutiny and that the Board's decision should not be upheld unless there is evidence to support a conclusion that labor relations will be positively improved by the merger. This approach assumes that the merger of two pre-existing units 'will inevitably have a significant negative effect upon stability in labor relations.' No data is presented to support this assumption, and indeed the facts of this case indicate the contrary.[11] On this record, the Lathrop plant has been successfully integrated into the multi-plant unit, and there is no evidence to suggest that that merger had any adverse impact on the labor relations or operations of either the Lathrop plant or any of the other plants within the multi-plant unit. Also, the approach of the dissenting opinion fails to give sufficient weight to the preference of the Brackenridge employees, which in this case was overwhelmingly in favor of merger.[12]
 
 
 19
 We therefore see no reason to depart from the doctrine that a unit determination by the Board should be disturbed only if it is unreasonable or arbitrary, and that thus the Board may find appropriate the combination of two preexisting units so long as there is evidence that there is a sufficient community of interest among the workers in the proposed unit to insure that the merged unit will also be a viable one. While we would not necessarily have made the same determination as the Board in this case, for the reasons discussed above, we cannot say it was beyond the Board's power.
 
 
 20
 For the foregoing reasons,[13] the petition of the Company to review and set aside the March 1, 1973, Supplemental Decision and Order of the Board will be denied, and the Board's cross-application for enforcement of the order will be granted.
 
 ROSENN, Circuit Judge (dissenting):
 
 21
 I dissent because I believe that the Board's finding as appropriate the inclusion of the Brackenridge plant in the multi-plant unit was arbitrary, unreasonable, and not supported by substantial evidence.
 
 
 22
 This appeal presents for review one of the most important issues in modern labor relations, the proper determination of the employee unit which is appropriate for collective bargaining between a union and an employer.[1] The problem is compounded, and its impact on the stability of labor relations magnified, because the issue raised here concerns altering a plant unit deemed appropriate for bargaining by both union and management since 1943.
 
 
 23
 I agree with the majority that the sole issue for review on this appeal is whether the Board's underlying determination as to the appropriateness of the ten-plant bargaining unit including the Brackenridge plant was erroneous.[2] The majority states that the Board's determination that the multi-plant unit was appropriate was based upon two factors. First,
 
 
 24
 the history of bargaining between the company and the Union demonstrates a pattern of successful bargaining in a unit of widely scattered plants which are not functionally or operationally integrated,
 
 
 25
 and second,
 
 
 26
 the Brackenridge . . . plant (does) not differ significantly from those plants which, over the years, have been successfully integrated into a single, multi-plant unit.
 
 
 27
 The majority concludes that the foregoing reasoning by the Board 'shows a careful consideration . . . of all the relevant factors' and is supported by substantial evidence in the record. I respectfully disagree.
 
 
 28
 We first note that the determination as to the appropriate bargaining unit in the instant case does not arise in the typical 'question of representation' proceeding under 9(c)(1) of the National Labor Relations Act. Such a proceeding arises when an employer declines to recognize the representative of unorganized employees who allege that they desire collective bargaining.
 
 
 29
 In the present case, however, there is no question as to which union is to represent the Brackenridge employees. There is no ambiguity or dispute over unit description, no change in employment patterns, no allegation of accretion to the bargaining unit, no dispute over job classification, and no allegations of operational changes in the unit. Rather, the union simply desires to merge two of its own established bargaining units and alter the historical relationship between the employer and the Brackenridge employees. The union unilaterally seeks this goal through Board intervention after failing to achieve that goal through free collective bargaining.[3]
 
 
 30
 The present case thus involves the attempt by one party to a collective bargaining agreement to combine two established bargaining units, not through negotiations, but by bringing an action before the Board of combine the units over the objection of the other party. I believe that the use of unit clarification proceedings by the Board of this purpose runs counter to the national policy in favor of free collective bargaining, and will inevitably have a significant negative effect upon stability in labor relations.[4]
 
 
 31
 I accept as the law of the case the holding that the Board does have the authority to 'clarify' units in order to combine two preexisting bargaining units by declaring the combined unit 'appropriate.' However, I do not believe the standards of appropriateness in such a situation should be the same unrestrictive standards that would govern were the Board to determine in the first instance in a 'representation' proceeding the unit in a plant or plants appropriate for collective bargaining. Rather, when the combination of two preexisting units is to be deemed an appropriate bargaining unit, the Board's determination should be scrutinized with care because of the concomitant disruption to preexisting labor relations which is likely to result. I believe that only affirmative and convincing reasons should justify the Board's finding that the combined unit is 'appropriate' in a situation such as this.
 
 
 32
 Turning now to the bases of the Board's decision as described by the majority, the reasoning is that the company has had successful multi-plant bargaining in the past, and there is no reason why addition of the Brackenridge plant to the multi-plant unit will alter that pattern. I do not find either of these considerations particularly helpful. The trust of this reasoning is that the merger of the units will not adversely affect the expanded multi-plant unit. It ignores completely the effect that such merger may have upon the established labor relations, commitments and operations at the single-plant unit. It says nothing about why the present separate units are inadequate, and it says nothing about the Board's own conclusion about whether labor relations will be improved or hurt by the merger. I do not believe that the merged unit can be deemed 'appropriate' in these circumstances unless the Board can present some positive justifications for a conclusion that labor relations will be improved by the merger.
 
 
 33
 The majority finds it unnecessary to consider factors other than those considered by the Board. For this it relies on a quotation from N.L.R.B. v. Jones & Laughlin Steel Corp., 331 U.S. 416, 422-423, 67 S.Ct. 1274, 1278, 91 L.Ed. 1575 (1947), stating that the Board's unit determinations
 
 
 34
 are binding upon reviewing courts if grounded in reasonableness . . .. A proper determination as to any of these matters, of course, necessarily implies that the Board has given due consideration to all the relevant factors and that it has correlated the policies of the Act with whatever public or private interests may allegedly or actually be in conflict. I do not believe, however, that the Board's determination in a case such as this is 'grounded in reasonableness' when the Board gives little or no weight to the factors which militate against the merger of two preexisting bargaining units. I cannot say that the Board 'has given due consideration to all the relevant factors' when it treats the determination of 'appropriateness' in the present case in the same way as it treats the question in the absence of two preexisting bargaining units. I cannot say that the Board 'has correlated the policies of the Act with whatever public or private interests may . . . be in conflict' when it applies a per se rule that the merged unit is appropriate simply because it would have been appropriate in the first instance.
 
 
 35
 The Board gives little or no weight to numerous factors which I believe weigh heavily against a finding that the merged unit is 'appropriate.' The Board considers the history of multiplant bargaining, but gives little weight to the uninterrupted history of separate bargaining by the Brackenridge plant since its acquisition in 1943. The Board considers as mere 'technical problems' the fact that only 'vargaining history and employer opposition have prevented' the establishment of the combined unit. While the Board may consider these factors 'technical,' in my opinion they go to the heart of the matter at issue.
 
 
 36
 I would also place considerable weight on the question of whether the unit to be merged out of existence is functionally or operationally integrated with the larger unit. The Board concedes that 'there is no basis for concluding that the operations of the various plants are integrated.' In fact, the Brackenridge plant is completely autonomous. It has its own plant manager and managerial staff. It hires and discharges its own employees. It makes its own work assignments, and does not interchange its production and maintenance employees with employees in other plants. There is no interplant seniority. The Brackenridge plant manager reports to the vice president in charge of special products manufacturing, while the plant managers in the multi-plant unit report to a vice president in the managing area. Brackenridge does its own customer billing, prepares its own payrolls, and does its own purchasing and invoicing.
 
 
 37
 The wages, pensions, and fringe benefits at Brackenridge differ from those at the multi-plant unit. The Brackenridge work force is over fifty percent women, a significantly greater proportion of women than the other plants. A plant executive testified that they were secondary wage earners, less interested in pensions than in other areas of compensation.
 
 
 38
 The Board apparently gives some weight to the secret ballot election it conducted among the Brackenridge employees after it found that the merged unit would be appropriate. This reliance on employee preference, however, is not decisive[5] and heretofore has never been utilized by the Board except in representation proceedings. In any event, if the Board is to rely upon the preferences of the Brackenridge employees, it should also be obliged to poll the employees in the existing multi-plant unit to determine whether they favor or oppose the addition of the Brackenridge employees to their unit. These employees might well oppose the merger, particularly if they felt that the enlargement of the unit might complicate or protract labor negotiations.
 
 
 39
 Neither before nor after this case has the Board upheld an attempt by means of a unit clarification petition to merge two preexisting units over the opposition of one party to the collective bargaining agreement with the units.[6] For example, in Bath Iron Works Corp., 154 N.L.R.B. 1069 (1965) employees in both the parent and the wholly-owned subsidiary were represented by the same union, albeit in separate bargaining units. When the parent merged the subsidiary into itself and operated the former subsidiary as a division, the union argued before the Board that the bargaining units should be merged because the employees in both units performed essentially the same duties. The employer, on the other hand, contended that the division should remain a separate unit because the employees possessed distinct skills and performed distinct functions. The Board refused to combine the units, finding no significant change in the operations of the former subsidiary. The Board held that although it could not say that only separate units would be appropriate, the corporate reorganization had not 'effected such changes in the status of the employees as would require us to find that the two units have been merged.' The Board thus held that even though the merged unit might be appropriate, the considerations in favor of the merged unit had not been established.[7] In the present case, of course, the Board relies solely upon a finding of 'appropriateness' for permitting the merger of the units without taking into account any reasons why the merged unit would be preferable to the preexisting separate units.
 
 
 40
 Nor has the unit clarification procedure which the Board adopted in its decision of January 12, 1968, ever been applied to a single case which arose after that decision. As Chairman Miller noted in his concurring opinion to the Board's Decision and Order of April 16, 1971, dismissing the unfair labor practice complaint,
 
 
 41
 The tortuous history of this proceeding, standing along, should persuade us that the principle which the Board so boldly announced in 1968 has proved to have extremely limited utility. The lesson of that history is confirmed by the fact that the Board has consistently refused since 1968 to follow and apply the Libbey-Owens-Ford doctrine, even in cases which were virtually indistinguishable.
 
 
 42
 I concluded from this progression of events, and for reasons briefly outlined below, that we must candidly acknowledge that we have abandoned our earlier decision and that we have reverted to those healthy principles which formerly governed our treatment of multi-plant bargaining units. For my part, I welcome the return to those principles. In my judgment, our duty to foster stable collective-bargaining relationships is well discharged by leaving the matter of changes in size of a multi-plant bargaining unit to be worked out by agreement of the parties.
 
 
 43
 189 N.L.R.B. No. 139 (1971) (concurring opinion).
 
 
 44
 Nor has the Board applied the doctrine to any cases since Chairman Miller wrote these words in 1971. This was recognized by Chairman Miller in his dissent to the March 1, 1973, Supplemental Decision and Order which is here on a petition for review. 202 N.L.R.B. No. 15 (1973) (dissenting opinion).
 
 
 45
 The majority attempts to distinguish the cases denying unit 'clarification' since 1968, either on their facts or on the grounds that the Board's statutory authority was not established on appeal at the time they were decided. It cannot, however, avoid the fact that the doctrine has yet to be applied to any case other than the one at hand. I agree with Chairman Miller that there is 'inequity inherent in joining in the issuance of this 'last oneway ticket." Id.
 
 
 46
 I would grant the company's petition to set aside the order and I would deny the Board's application for enforcement.
 
 
 
 [1]
 The plant at Parkersburg, West Virginia, was removed from the multi-plant unit in 1941, pursuant to the Board decision in Libbey-Owens-Ford Glass Company, 31 N.L.R.B. 243 (1941). In 1958, the Company sold this plant
 
 
 [2]
 At the hearing in the unfair labor practice case, the Union also filed a petition for clarification (6-UC-43) to include the Mason City, Iowa, plant as part of the multi-plant unit. The Company moved to have the petition made a part of this case, but the Administrative Law Judge denied that motion. On April 16, 1971, the Board (with members Brown and Kennedy dissenting) handed down its decision dismissing the petition to include the Mason City plant in the multi-plant unit. 189 N.L.R.B. 869 (1971). Members Fanning and Jenkins voted for dismissal for the reasons stated in their dissenting opinions in 169 N.L.R.B. 126, 129, and Chairman Miller, for the reasons stated in his concurring opinion in 189 N.L.R.B. 871, 871-72
 
 
 [3]
 '(b) The Board shall decide in each case whether, in order to assure the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . ..' 29 U.S.C. 159(b)
 
 
 [4]
 In Packard Motor Car, supra, 330 U.S. at 491, 67 S.Ct. 789, the Supreme Court made it clear that the scope of review, insofar as the Board's unit determination depended on facts, was limited to whether there was substantial evidence to support the Board. See also N.L.R.B. v. Industrial Rayon Corp., 291 F.2d 809 (4th Cir. 1961); N.L.R.B. v. Plankinton Packing Co., 265 F.2d 638 (7th Cir. 1959)
 
 
 [5]
 The Company claims that the evidence demonstrates the absence of such factors as a history of multi-plant bargaining that includes the plant in question, centralization of management, employee inter-change among plants, similarity of skills and functions of employees, inter-dependence or functional integration of operations, and geographical proximity
 
 
 [6]
 The Court in Pittsburgh Plate Glass, supra, stressed such factors as the wishes of the employees, the similarity of the working duties and conditions, the character of the various plants, and the anticipated effectiveness of the bargaining unit in maintaining industrial peace
 
 
 [7]
 As the Board noted, neither party sought their inclusion in the multi-plant unit, since one was an experimental plant manned solely by technical employees, and the other was a subsidiary engaged in the production of plastic and metallic dies, patterns, and molds. 169 N.L.R.B. 126, n. 5
 The later establishment of a new plant at Mason City was not relevant to the Board's decision, since, as the Board noted in its Supplemental Decision and Order of March 1, 1973, 'the unit determination was proper and correct when made.' 202 N.L.R.B. No. 15 at n. 17. Moreover, nothing in the record indicates one way or the other whether the Mason City plant would also be includable in the multi-plant unit, based on the criteria applied with respect to Brackenridge, for the Board dismissed the Union's petition to merge Mason City into the multi-plant unit for the same reasons it originally dismissed the complaint in the instant case. 189 N.L.R.B. 869.
 
 
 [8]
 The Company also cites as evidence of the difficulty in merging Brackenridge into the multi-plant unit the differences in benefits, and in particular the fact that the pension benefit in the multi-plant unit was $4.25 per month per year of service, while the normal pension for Brackenridge was $2.50 per month per year of service. The reason for this variation, according to the testimony of Mr. Burwell, is that Brackenridge employs over 50% Women, many of whom are secondary wage earners whose interests are less in pensions than in money in other areas. this difference does not appear to be a complete obstacle to successful bargaining between the Company and an enlarged multi-plant unit which included Brackenridge. In his testimony at the initial hearing on the unit clarification petition, Mr. Burwell also adverted to a similar difficulty in devetailing the youthful Lathrop workforce into the multi-plant pension system, but, as noted above, the Company later agreed to the inclusion of Lathrop. It is not the function of this court to pass on the wisdom of multi-plant bargaining as being in the best interests of the Brackenridge employee, who voted over-whelmingly (391 to 19) for inclusion in the multi-plant bargaining unit
 
 
 [9]
 At the initial hearing in this case, there was testimony that although Brackenridge was then engaged in the production of automotive ventilators, that aspect of the business was being phased out
 
 
 [10]
 The Company also cites American Saint Gobin Corp., Case Nos. 6-AC-13 and 6-UC-23, where petitions filed by the Union were dismissed by the Regional Director on the authority of PPG Industries. Since this was not a decision of the Board, it has little bearing on the question of discrimination and need not be considered
 
 
 [11]
 Recognizing the problem presented by the language in note 4 of the dissenting opinion, we note that the situation described there is not presented by the record in this case
 
 
 [12]
 See Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. at 156, 61 S.Ct. 908, 85 L.Ed. 1251. See also N.L.R.B. v. Ideal Laundry and Dry Cleaning Co., 372 F.2d 307, 309 (10th Cir. 1967), where the court said, 'Indeed, we think the relevancy of the wishes of employees concerning their inclusion or exclusion from a proposed bargaining unit is inherent in the basic right to self-organization under 7 of the Act.'
 
 
 [13]
 All other contentions of the Company have been considered and rejected
 
 
 [1]
 'Unit determination may profoundly affect labor management relations and constitutes a heavy proportion of the work of the NLRB.' Samoff, Law School Education in NLRB Representation Cases, 21 Lab.L.J. 691, 695 (1970), quoting Dean Bok in Discussion, Proceedings of the 19th Annual Winter Meeting, Industrial Relations Research Association at 99-104 (1966)
 
 
 [2]
 I agree with the view originally expressed by Board members Fanning and Jenkins that the Board does not have statutory authority to conduct employee elections in a unit clarification proceeding such as this involving the merger of two previously appropriate units. See 169 NLRB No. 2 (concurring and dissenting opinion). In my opinion the Board exercised a power neither directly nor impliedly supported by the National Labor Relations Act
 I am constrained, however, to accept this court's holding on the prior appeal as the law of the case. I do not believe that the prior holding is decisive of the issue raised on this appeal.
 
 
 [3]
 The union first requested in October 1965 that the Brackenridge employees be included in the multi-plant unit. The request was then refused by the company and dropped by the union. The union made the same request in the October 1968 multi-plant negotiations, but the company refused. When the separate Brackenridge contract expired in September 1969, the company again refused the union's demand that the multiplant contract be made applicable to the Brackenridge employees
 
 
 [4]
 For example, a union decides to organize two plants of an employer. It is apparent to the organizer that the union has a better chance of winning at plant 'A' than at plant 'B'. It therefore petitions for a single unit at plant 'A' and after winning the election is certified on a single unit basis. Later when chances of success at plant 'B' seems brighter, it petitions for an election at plant 'B' on a single unit basis. It wins the election and is certified, again on a single-plant unit basis. It then petitions for clarification of the unit to include both plants. The process can continue ad injinitum as the union continues to 'nibble away' at the employer. Such a procedure does not lead toindustrial stability-- it leads to chaos, confusion and conflict
 Brief for Employer at 48, PPG Industries, Inc., No. 6-UC-8 (N.L.R.B., filed December 9, 1966) quoted in Abodeely, The NLRB and the Unit Clarification Petition, 117 U.Pa.L.Rev. 1075, 1100 (1969).
 
 
 [5]
 In refusing to conduct a similar election in the unit clarification proceedings in Pittsburgh Plate Glass Industries, 180 N.L.R.B. 477 (1969), the Board stated:
 Our 'informed discretion'-- to use the words of the Supreme Court in the Packard case (330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040)-- tells us that in circumstances such as these the Board should not gamble on stability of bargaining by delegating to employees choice of the enlargement of the multi-plant unit . . ..'
 
 
 [6]
 Since its inception the unit clarification petition has been used only where there has been some change in the employment pattern. The creation of a new job classification, the movement of personnel, or the acquisition of a new plant have all involved some change which would clearly affect the delineation of the existing bargaining unit. Where, however, there has been no change in the employment pattern, the Board has found no need to clarify the bargaining unit. Unfortunately, the decision in Libbey-Owens-Ford completely ignored these precedents
 Abodeely, The NLRB and the Unit Clarification Petition, 117 U.Pa.L.Rev. 1075, 1091 (1969).
 
 
 [7]
 See also Remington Office Machines et al., 158 N.L.R.B. 994 (1966); Univac Division, Sperry Rand Corporation et al., 158 N.L.R.B. 997 (1966); Welsh Co. et al., 145 N.L.R.B. 713 (1964)