Verlin L. PULLEY and Carola Pulley, d.b.a. Capitol-Varsity Cleaning Co., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 17846.

United States Court of Appeals Sixth Circuit.

June 5, 1968.

J. Mack Swigert, Cincinnati, Ohio (Jerold A. Fink, Cincinnati, Ohio, on the brief) for petitioner.

Leon M. Kestenbaum, N.L.R.B., Washington, D. C., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Atty., N.L.R.B., Washington, D. C., on the brief) for respondent.

Before COMBS, Circuit Judge, and McALLISTER and CECIL, Senior Circuit Judges.

CECIL, Senior Circuit Judge.

This cause is before the Court upon petition of Verlin L. and Carola Pulley, d. b. a. Capitol-Varsity Cleaning Co., (Capitol), to review an order of the National Labor Relations Board issued on April 13, 1967. The Board has cross-petitioned for enforcement of its order which is reported at 163 NLRB 145. This Court has jurisdiction of the proceeding, the alleged unfair labor practices having occurred in Oxford, Ohio, within this judicial circuit. Section 160 (e), Title 29, U.S.C. The Board found that Capitol committed unfair labor practices in violation of Section 158(a) (1), (3) and (5), Title 29, U.S.C.

Capitol is in the laundry and dry cleaning business and also reconditions athletic equipment. Its central plant, the one involved in the dispute herein, is located in Oxford, Ohio. William Pulley, who is the son of Capitol's owners, is the general manager. Andrew McLaugh-

lin is the production manager and is responsible for the daily management of the Oxford facility. The unfair labor practice charges, which are the basis of the order now before us, were filed by AFL-CIO Laundry and Dry Cleaning International Union, Local No. 248, (the union).

■ The union commenced an organizational campaign at Capitol's Oxford plant on March 11, 1966, which culminated in a strike beginning on March 29, 1966. The Board found that during the course of this campaign, of which Capitol was fully aware, Capitol committed numerous acts in violation of Section 8(a) (1) of the Act by "interrogating its employees as to their union membership and activity, by requesting them to report the names of employees engaging in union activity, and by creating the impression that it was keeping union meetings or attendance thereat under surveillance." We find that there is substantial evidence in the record considered as a whole to support these findings and conclusions of the Board. Section 160 (e), Title 29, U.S.C.

On March 16, 1966, the union formally demanded recognition, claiming to represent a majority of Capitol's employees. Such demand was premature because on that date the union only represented 49 of the 99 employees in the appropriate bargaining unit, one less than the required majority. By March 29th the union possessed authorization cards from 10 more employees. On March 17, 1966, Capitol wrote the union stating that it had a good faith doubt as to the union's majority status and that it had filed a petition with the Board seeking an election. On the following day the union also filed a representation petition with the Board. On March 29th Moser, a union organizer, saw Pulley and orally informed him that the union represented a majority of Capitol's employees and requested recognition and bargaining, which was refused. A strike began at 11:45 p. m. that night. Shortly thereafter, Pulley arrived at the plant where Moser told him that the strike would be called off if Capitol recognized the union. On April 9, 1966, the union sent a telegram to Capitol again formally asserting its majority status, requesting recognition and offering to submit to a card check by the N.L.R.B. On April 11th, the union, realizing that the Board does not check cards, offered to submit to a card check by a third neutral party. Capitol replied on April 12th, stating,

"As you know the National Labor Relations Board is investigating our charge that your union has engaged in threats and coercion in its current attempt to seek recognition. We do not believe that any organization engaging in this conduct can be the freely chosen representative of our employees. Moreover Section 9(c) (1) of Act requires Board to direct an election by secret ballot whenever there is a question concerning representation. Therefore we repeat that we will abide by the results of a proper secret ballot NLRB election."

The union filed unfair labor practice charges on April 12, 1966, which prevented the holding of the representation election.

The Board held that although the union did not represent a majority of employees on the date of its initial request for recognition, March 16, 1966, it did represent a majority at the time of its later requests, and that Capitol did not possess a good-faith doubt as to its majority status. The Board found that this conduct amounted to a violation of Section 8(a) (5) and (1) of the Act and ordered Capitol to recognize and bargain with the union.

■ Capitol alleges that the union did not possess a majority of valid authorization cards because 24 of the signed cards were solicited by Glenn Parker, who at the time was a "supervisor" within the meaning of the Act. Cards solicited by supervisors are invalid and may not be counted in determining whether a union represents a majority of employees in an appropriate bargaining unit. N.L.R.B. v. Hamilton Plastic Molding

Company, 312 F.2d 723, (C.A.6). The Board held that Parker was not a "supervisor," but an "employee."

■■■ Section 152(11), Title 29, U.S.C. defines a supervisor as follows:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Whether an employee is a supervisor or not is a question of fact, and the Board's resolution of that issue is conclusive if supported by substantial evidence. Peoples Service Drug Stores, Inc. v. N.L.R.B., 375 F.2d 551, (C.A.6); N.L.R.B. v. Ertel Manufacturing Corporation, 352 F.2d 916, (C.A.7), cert. den., 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208; Eastern Greyhound Lines v. N.L.R.B., 337 F.2d 84, (C.A.6). The considerations are so "infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'" N.L.R.B. v. Swift and Company, 292 F.2d 561, 563, (C.A.1).

■ Parker began his employment with Capitol as a truck driver in September, 1965. In December of that year, McLaughlin asked Parker if he would like to temporarily replace Dale Baird as his assistant while Baird was away at school from late January to April, 1966. Parker accepted and shortly thereafter began working with Baird. Baird's duties included the distribution of unpressed garments to the pressers for finishing. The pressers were paid on a piece-rate basis and it was Baird's job to try to make certain that each presser had an equal share of easy and hard items to press so that their pay would be approximately equal. In addition to this, Baird had the authority to hire and fire employees, and scheduled the work in the department by telling the pressers when to start and finish. Both the Board and Capitol admit that Baird was a "supervisor." The extent to which Parker assumed Baird's responsibilities is determinative of the issue of Parker's status. Capitol concedes that Parker did not have the authority to hire and fire. McLaughlin testified that normally he would tell Parker what time the pressers should begin work and Parker relayed the instructions to the pressers. Only on infrequent occasions when McLaughlin was gone from the plant did Parker make the decision himself. Parker always checked with McLaughlin or Pulley before granting an employee's request to come in late or leave early. Parker never ordered supplies or reprimanded employees. Parker's primary function was to distribute the garments to pressers in a manner so as to equalize the pay among the pressers. This job was occasionally performed by other employees while Parker was out in the truck. It is possible that Parker performed some supervisory functions on the rare instances when both Pulley and McLaughlin were absent from the plant, but such infrequent activities do not change the status of an employee to a "supervisor." Poultry Enterprises v. N.L.R.B., 216 F.2d 798, (C.A.5). Parker was not trained to be a permanent replacement for Baird, having identical powers and responsibilities, but was given the job on a temporary basis without the accompanying supervisory authority. Although the distribution of garments to be pressed involved some exercise of judgment, and could affect the earnings of a presser, it was merely of a routine nature and did not involve the use of independent judgment as the Act requires.

■ Therefore we conclude that there was substantial evidence to support the finding of the Board that Parker was not a supervisor at the time he solicited

the siguatures on the 24 cards in question. This being the case, the union possessed a majority of valid authorization cards when it made its demand for recognition in late March and early April 1966.

But the mere existence of a majority of valid authorization cards is not sufficient to support a finding of an 8(a) (5) violation, if the employer has a good faith doubt as to the majority status of the union. An employer is not required to recognize and bargain with a union if it possesses a good faith doubt as to its majority status. N.L.R.B. v. H & H Plastics Manufacturing Co., 389 F.2d 678, (C.A.6); Peoples Service Drug Stores, Inc. v. N.L.R.B., supra. The procedure of determining the majority status of a union by presentation of individually solicited authorization cards, rather than by a Board supervised election, has been discredited as a "notoriously unreliable method of determining majority status of a union." N.L.R.B. v. Flomatic Corporation, 347 F.2d 74, (C.A.2). See also, Pizza Products Corp. v. N.L.R.B., 369 F.2d 431, (C.A.6); Peoples Service Drug Stores, Inc. v. N.L.R.B., supra.

An allegation on the part of an employer that he possesses a good faith doubt as to the majority status of a union is not in the nature of an affirmative defense upon which the employer has the burden of proof. Rather the burden of proof is on the General Counsel to establish the bad faith of the employer in refusing to bargain with a union claiming to represent a majority of his employees. N.L.R.B. v. River Togs, Inc., 382 F.2d 198, (C.A.2). As the Board admits in its brief, "this burden is not met simply by showing that the employer has advanced no reason for his doubt." Merely proving that an employer rejected a card check in favor of a Board supervised election is not sufficient to negative a claim of good faith doubt. Textile Workers Union of America v. N.L.R.B., 386 F.2d 790, (C.A.2). The proof may ultimately indicate that there was no reasonable basis

for the employer's asserted good faith doubt. But this is not dispositive of the case for all that is required is an honest doubt, whether or not such doubt is justified. Peoples Service Drug Stores, Inc. v. N.L.R.B., supra.

The commission of unfair labor practices by an employer may reflect on his claim of a good faith doubt, but such practices alone are insufficient in and of themselves to negative a good faith doubt. Peoples Service Drug Stores, Inc. v. N.L.R.B., supra; Montgomery Ward & Co. v. N.L.R.B., 377 F.2d 452, (C.A.6). An employer's assertion of a good faith doubt is subject to great suspicion if it is used to gain time in which to dissipate the strength of the union. N.L.R.B. v. Cumberland Shoe Corporation, 351 F.2d 917, (C.A. 6); Joy Silk Mills v. N.L.R.B., 185 F.2d 732, (C.A.D.C.), cert. den. 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.

The union orally demanded recognition on March 29, 1966, claiming to represent a majority of Capitol's employees, and went out on strike on that date in support thereof. On April 9th, it sent a telegram to Capitol formally requesting recognition and agreeing to submit to a card check by the N.L.R.B. On April 11th, the union, realizing that the Board does not perform card checks, suggested a card check by an impartial third party. On April 12th, Capitol telegraphed its response to the union stating that because it believed the union had engaged in coercive conduct during its organizational campaign, it felt that an election was the appropriate way to resolve the issue. On April 5th, Capitol filed an unfair labor practice charge against the union alleging that:

"Since on or about March 29, the above named labor organization, and its agents, Richard Moser, James Wilson, Glenn Parker, and Ralph Newton, have threatened, coerced, and intimidated employees of Capitol Varsity and others, to restrain said employees and persons from refusing to engage

in union activity, a right protected by Section 7 of the Act."

The trial examiner refused to count one of the union's cards because he found that it was secured by a threat that the employee would be fired if the union "got in." There was testimony, although discredited by the trial examiner, that Parker threatened an employee with loss of her job if she did not sign the authorization card. Parker also threatened three other employees with loss of jobs at the time the strike began.

The unfair labor practices committed by Capitol all occurred within the period from March 14th to March 22nd, prior to the time the union presented a legitimate request for recognition. There is no evidence of any subsequent unlawful conduct by petitioner. Of the 11 people who were the objects of Capitol's unfair labor practices, 9 of them were active members of the union. Thus it appears that Capitol's illegal activities had little if any effect on the freedom of choice guaranteed by the Act. In addition, Capitol upon receiving the first formal request for recognition immediately filed for a representation election on March 17th to resolve the issue.

▆ Thus we have a situation in which the employer promptly expressed a good faith doubt, the union admittedly engaged in coercion in obtaining at least one signature and allegedly engaged in other illegal conduct on other occasions, the employer's unfair labor practice seemingly did not dissipate union strength, no unfair labor practices were committed subsequent to the union's demand for recognition and the employer promptly filed a petition for a representation election. In these circumstances we hold that the General Counsel has not met the burden of affirmatively proving, by substantial evidence, the bad faith of Capitol in refusing to recognize the union and that Capitol did indeed possess a good faith doubt as to the union's majority status. Therefore Capitol was not guilty of refusing to recognize and bargain with the union in violation of Section 8(a) (5) of the Act.

▆ The Board held in the alternative that even if Capitol was not guilty of an 8(a) (5) violation "its unfair labor practices prevented the holding of a fair election and tended to dissipate the Union's strength. Inasmuch as the Union enjoyed majority status as evidenced by authorization cards, a bargaining order is an appropriate remedy for the violation of Section 8(a) (1) described above."

▆ The following quotation from N.L.R.B. v. Flomatic Corporation, supra, 347 F.2d at p. 78, was cited with approval by this Court in Pizza Products Corporation v. N.L.R.B., supra:

"A bargaining order, however, is strong medicine. While it is designed to deprive employers of a 'chance to profit from a stubborn refusal to abide by the law,' (Citation omitted) and although it undoubtedly operates to deter employers from adopting illegal intrusive election tactics, its potentially adverse effect on the employees' § 7 rights must not be overlooked. (Citation omitted). That section protects the right of employees to join or refrain from joining labor organizations. And that right is implemented by Section 9(c) (1) which provides for representation elections by secret ballot. Since a bargaining order dispenses with the necessity of a prior secret election, there is a possibility that the imposition of such an order may unnecessarily undermine the freedom of choice that Congress wanted to guarantee to the employees, and thus frustrate rather than effectuate the policies of the Act.

\* \* \* \* \* \*

"\* \* \* moreover it is beyond dispute that secret election is a more accurate reflection of the employees' true desires than a check of authorization cards collected at the behest of a union organizer."

This Court recognizes the discretion that exists in the Board to fashion a remedy appropriate to each particular case. N.L.R.B. v. H & H Plastics Manufacturing Co., supra; N.L.R.B. v. Delight

Bakery, Inc., 6 Cir., 353 F.2d 344. This Court has approved recognition orders to remedy 8(a) (1) violations in extreme circumstances. N.L.R.B. v. Delight Bakery, Inc., supra.

■ ■ A recognition order based solely upon 8(a) (1) unfair labor practices is a remedy reserved only for the most flagrant abuses of employee rights. It should be used sparingly and with discretion. In the cases in which such orders have been upheld there has been proof that the illegal acts of the employer have caused the union to lose its majority status, thus preventing a fair election at a later date. E. g., N.L.R.B. v. Delight Bakery, Inc., supra; Wausau Steel Corporation v. N.L.R.B., 377 F.2d 369, (C.A.7); United Steelworkers of America v. N.L.R.B., 376 F.2d 770, (C.A. D.C.). Relatively minor or borderline violations or unfair labor practices which only have a minimal effect on the alleged majority of a union are not serious enough to require the drastic remedy of a recognition order. N.L.R.B. v. Flomatic Corporation, supra; N.L.R.B. v. Delight Bakery, Inc., supra; N.L.R.B. v. Gotham Shoe Manufacturing Co., 359 F.2d 684, (C.A.2); Irving Air Chute Co. v. N.L.R.B., 350 F.2d 176, (C.A.2); Wausau Steel Corporation v. N.L.R.B., supra.

In the instant case the Board seeks to justify its recognition order on the grounds that the 8(a) (1) violations were so serious as to dissipate the union's majority and make a fair election impossible. However there is no proof in the record that Capitol's illegal activities had the effect of destroying the union's majority. As we stated before 9 of the 11 employees against whom 8(a) (1) violations were committed were strong union supporters. The unfair labor practices did not prevent other employees from signing authorization cards. Almost all of the authorization cards were signed during the period that Capitol committed its unfair labor practices, and 10 were signed after it ceased its illegal activities. Such evidence is contrary to any assertion that Capitol dissipated the union's majority. Furthermore the interrogations and the creation of an impression of surveillance were relatively minor in relation to those committed in cases where recognition orders were issued based solely on 8(a) (1) violations. It is difficult to conclude that in this case Capitol's unfair labor practices required a recognition order as opposed to the more democratic remedy of an election.

■ Therefore we hold that the Board erred in requiring Capitol to recognize and bargain with the union on the basis of its 8(a) (1) unfair labor practices but should have ordered a representation election.

The union began a strike against Capitol on March 29, 1966. On April 5th Capitol erroneously believed that the employees might apply for reinstatement. To meet this expected development, Capitol prepared several form letters denying reinstatement to those whose applications would be rejected. Through a clerical error, one of the form letters was sent to Parker. The letter said: "You have been permanently replaced. Your application for reinstatement is therefore denied." When it realized its mistake, two days later, Capitol wrote Parker: "Disregard that part of our letter sent to you dated April 5th which refers to your offer of reinstatement; however, you have been permanently replaced." The strike ended in July, 1966, and beginning July 5th, the strikers, except Parker, began applying for reinstatement.

The Board concluded that the strike beginning on March 29th, was an unfair labor practice strike and that all strikers were entitled to reinstatement upon application regardless of whether they were replaced or not. The Board ordered Capitol to offer reinstatement to those employees who began striking on March 29, 1966, and who applied for reinstatement within a reasonable time after the strike ended, but that Capitol did not have to reinstate employees lawfully discharged for misconduct. The Board further held that Capitol committed an un-

fair labor practice in violation of Sections 8(a) (3) and (1) of the Act because "by notifying striker Glenn Parker during the aforesaid (unfair labor practice) strike that he had been permanently replaced, the Company purported to terminate his employment." The Board excused Parker from making application for reinstatement because it believed such action would be futile, and ordered his immediate reinstatement with back pay for the time he was not a striker.

Unfair labor practice strikers are entitled to reinstatement regardless of whether they have been replaced. Philip Carey Mfg. Co. v. N.L.R.B., 331 F.2d 720, (C.A.6), cert. den. 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92. Economic strikers, strikers who have gone out on strike for reasons other than their employers' unfair labor practices, are only entitled to reinstatement, at the end of the strike, if they have not been permanently replaced. National Labor Relations Board v. Mackay Co., 304 U.S. 333, 8 S.Ct. 904, 82 L.Ed. 1381. The Board claims that the strike beginning March 29, 1966, was an unfair labor practice strike caused by Capitol's failure to recognize and bargain with the union and by its 8(a) (1) violations. Inasmuch as we have held that Capitol did not commit an 8(a) (5) violation, the strike cannot be labeled an unfair labor practice strike because of Capitol's refusal to recognize and bargain with the union. It remains to be determined if the strike was called in response to Capitol's 8(a) (1) violations.

The union in its initial letter of March 16, 1966, demanding recognition stated its belief that certain conduct of Capitol's supervisors were unfair labor practices and indicated that if such practices did not cease, the union might, among several other things, take "economic action in the form of work stoppage." When Moser, a union organizer, confronted Pulley outside the plant at the beginning of the strike, late March 29th, Moser told Pulley that the employees struck "because he (Pulley) would not recognize the union, that they

felt that they were being treated very badly by supervision." 'Moser told Pulley that he thought certain of managements acts violated the National Labor Relations Act. However at the March 29th encounter, the testimony of Moser indicates that he stressed the union demand for recognition.

"Q. Did you reply to Mr. Pulley's question as to whether, as to why you were stopping the work? A. Yes, sir, I told Mr. Pulley that the people had authorized this committee to stop work and that we were still asserting our right and that we represented a clear majority of the employees in the production and maintenance and distribution unit and again offered to meet to perpetuate recognition of the Union and I told him if he would agree to meet that next morning or within the next few days that I would get the employees who had already walked out of the plant to come back in the plant— they were still out there on the street and that I also would contact the day workers and be sure that they came in to work as well as removing the picket line, and Mr. Pulley said that he couldn't do anything without first talking to his attorney. He asked us why we struck and I told him that the employees struck because he would recognize the Union, that they felt they were being treated very badly by supervision."

At the first general union meeting held on March 17th, Moser explained to the employees present the procedure he had followed in demanding recognition from Capitol. An employee present at the meeting called for a strike vote, which was carried. Moser's testimony does not indicate any mention of any unfair labor practices being made at this meeting. At the second union meeting held March 28, 1966, Moser related to the employees the developments which had transpired since March 17th. Although some complaints were voiced concerning the activities of management, the main purpose of the meeting was to elect a bargaining committee with authority to au-

thorize a work stoppage if the committee thought one necessary. The bargaining committee met on March 29th, at which time Moser told them the following:

"Mr. Verst: What did you tell them?

A. I told the committee I had met with Mr. Pulley on the sidewalk of the plant that morning and had again told him I represented a majority of the employees in production, maintenance and distribution, and that I was a representative of the Union and that at a meeting on the 28th the unit had authorized the committee to call a work stoppage if necessary and named that committee to him."

He did not mention that he told them of any unfair labor practices. The committee unanimously voted to call a strike. On that same day Moser sent the following telegram to Pulley:

"ATTEMPTS TO NOTIFY YOU OF STRIKE ACTION BY YOUR EMPLOYEES WHO SEEK RECOGNITION OF THEIR UNION HAVE BEEN IGNORED STOP THIS TELEGRAM ADVISES YOU STRIKE DEADLINE TONIGHT 1145PM MARCH 29TH 1966 STOP I CAN BE REACHED IN OXFORD PHONE 523-6311."

No mention was made of any unfair labor practices in the telegram.

■■■■ In spite of some infrequent complaints about managements' activities, the only reasonable inference that can be drawn from these facts is that the primary and sole purpose of the strike beginning March 29, 1966, was to secure recognition of the union. The telegram informing Pulley of the strike only refers to a desire for recognition. The first strike vote was taken at the March 17th meeting at which unfair labor practices were not mentioned. It is true that complaints about managements' activities were voiced at the March 28th meeting, but the dominant theme of that meeting was recognition and strike procedures. Furthermore, at the meeting at which the bargaining committee voted for a work stoppage no

mention of unfair labor practices was made. It appears that the employees' concern was exclusively with recognition and would have struck regardless of any employer unfair labor practices. N.L.R.B. v. Wooster Div. of Borg-Warner Corp., 236 F.2d 898, (C.A.6), modified on other grounds, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823; Simmons Inc. v. N.L.R.B., 315 F.2d 143, (C.A.1). Therefore we hold that there was no substantial evidence to support the Board's conclusion that the strike beginning March 29, 1966, was an unfair labor practice strike. Section 160(e), Title 29, U.S.C. We further conclude that the Board's order was too broad in requiring Capitol to reinstate all strikers regardless of whether they were replaced or not. The order should have been limited to requiring reinstatement of only those strikers whose positions had not been filled by other employees when they applied for reinstatement.

■■■■ Because the strike was not an unfair labor practice strike, Parker was not entitled to reinstatement as a matter of right. He was entitled to reinstatement only if he was not replaced by another employee. The Board found that "Parker had been replaced, for he was the most junior in employment of the regular truckdrivers, and the Company to get truckdrivers during the strike had promised permanent employment as a truckdriver to one of the employees in its reconditioning department." Inasmuch as the Board specifically found that Parker had been replaced, Capitol could not have committed an 8(a) (3) unfair labor practice by refusing to reinstate him.

The Board's order is affirmed and enforcement granted as to those portions finding that Capitol violated Section 8(a) (1) of the Act by interrogating its employees about their union membership and activities, by requesting its employees to engage in surveillance and by creating the impression of surveillance and by ordering Capitol to cease and desist from such unlawful activity and to post an appropriate notice concerning

such activity. The Board's order is set aside and enforcement denied as to those portions finding Capitol guilty of 8(a)(5) and 8(a)(3) violations and ordering Capitol to recognize and bargain with the union and offer immediate reinstatement with back pay to Glenn Parker. The Board's order directing that Capitol offer immediate reinstatement to those strikers not already rehired shall be modified to limit reinstatement to those employees who were not replaced at the time the strike ended.