INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO–CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, White-Westinghouse Corp., Intervenor.

WHITE–WESTINGHOUSE CORPORATION, a wholly owned Subsidiary of White Consolidated Industries, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, International Union of Electrical, Radio and Machine Workers, etc., Intervenor.

Nos. 77–1453, 77–1600.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1979.

Decided July 9, 1979.

13. EPA's ambient air quality standards are specified in terms of nonmethane hydrocarbons. *See* 44 Fed.Reg. 20086.

David J. Millstone, Cleveland, Ohio, with whom James R. Tritschler, Cleveland, Ohio, was on the brief, for petitioner in No. 77–1600 and intervenor in No. 77–1453.

Winn Newman, Washington, D.C., with whom Ruth Weyand, Washington, D.C., was on the brief, for petitioner in No. 77–1453 and intervenor in No. 77–1600.

Janet C. McCaa, Atty., N. L. R. B., Washington, D.C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Patrick J. Szymanski, Atty., N. L. R. B., Washington, D.C., were on the brief, for respondent.

Richard Sobol and Judith Bonderman, Washington, D.C., entered appearances for petitioner in No. 77–1453 and intervenor in No. 77–1600.

Before TAMM and ROBINSON, Circuit Judges, and GERHARD A. GESELL, U. S. District Judge for the District of Columbia.*

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

In No. 77–1600, we review an order of the National Labor Relations Board (Board)[1] finding that White-Westinghouse Corporation (White-Westinghouse or Company) violated sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1), (5) (1976),[2] when it refused to bargain on a multiplant basis with the International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC (Union).[3] In No. 77–1453, we review the Board's failure to order the Company to compensate employees for wages lost during a strike precipitated by the Company's unfair labor practices. We affirm the Board's action in both cases.

I

On March 1, 1975, White-Westinghouse acquired the physical assets of Westinghouse Electric Corporation's (Westinghouse) appliance division.[4] The appliance division

---

\* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The Board's opinion and order is reported at 229 N.L.R.B. 667 (1977).

2. As relevant to this case, 29 U.S.C. § 158 (1976) provides:
 (a) it shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

3. The Board cross-petitions for enforcement of its order.

4. White Consolidated Industries, Inc. purchased the assets from Westinghouse and immediately transferred them to White-Westinghouse, a wholly owned subsidiary created solely for this purpose.

included five unionized plants.[5] These five facilities encompassed six bargaining units which, prior to the acquisition, were part of forty-two separately certified units of Westinghouse employees represented by the Union or one of its locals.

Although the units were separately certified, the Union and Westinghouse negotiated since 1950 on a multiplant, national basis through a Union committee called the Westinghouse conference board.[6] This highly centralized bargaining system curtailed most local negotiation. The national agreements authorized bargaining between local management and Union officials only on "procedures for administering the provisions in [the] agreement and other items of collective bargaining not Company wide in character and generally applicable to the various collective bargaining units." *White-Westinghouse Corp.*, 229 N.L.R.B. 667, 668 (1977). Local supplemental agreements could not be inconsistent with terms of the national agreement and had to be ratified by the conference board. Termination of the national agreement automatically terminated local supplements.

Before finalizing the transfer of the Westinghouse facilities, White-Westinghouse agreed to adopt virtually all provisions of the existing national agreement.[7] After the transfer, White-Westinghouse instituted only two changes, both consistent with the national agreement. First, White-Westinghouse insisted that appeal level grievance meetings be held in cities where individual plants were located instead of in a central location. Second, the Company designated local, instead of headquarters, representatives as its agents at these meetings. The conference board continued to represent the Union.[8]

Operations under White-Westinghouse remained basically unchanged. Manufacturing production continued without interruption, although a larger proportion of the appliances were sold under various private labels, and each plant was given greater individual responsibility for its operations and profits. The ownership transfer did not affect the service centers and parts depots. White-Westinghouse retained most plant managers, supervisory personnel, production, and clerical employees.[9]

Over the course of the next several months, White-Westinghouse and the Union met to discuss various aspects of the contract which was due to expire in July,

---

5. The five facilities are the Columbus Products Division, Columbus, Ohio; the Mansfield Products Company, Edison, New Jersey; the Newark Parts Depot, Newark, Ohio; and the Miami-Fort Lauderdale, Florida, Service and Repair Branch.

6. Local Union members, by secret ballot, elected delegates to the conference board on the basis of one delegate per each one thousand members and an additional delegate for specified fractions of the next one thousand. A local could not, however, have more than four nor less than one conference board delegate regardless of its size. A negotiating committee was elected from the conference board. It solicited suggestions for bargaining proposals from the conference board as well as from local meetings held throughout the country. An agreement accepted by the conference board was immediately binding upon all Union members. The conference board was also exclusively responsible for administering all agreements between Westinghouse and the Union and was the only body authorized to invoke arbitration proceedings or to call or terminate a strike.

7. The national agreements executed by Westinghouse and the Union consisted of two parts, each separately negotiated. The first covered terms traditionally found in collective bargaining agreements, such as wages, seniority, hours of work, holidays, vacations, strikes, dues check-off provisions, and grievance and arbitration procedures. The second established various employee benefits, including pensions, savings, and insurance plans, all of which were administered nationally. White-Westinghouse agreed to all terms except those relating to an employees' savings plan.

8. The Union formed a White-Westinghouse conference board to represent all Union employees within the newly acquired appliance division.

9. Some employees left due to normal attrition; others were dismissed when staff reduction was necessary to keep production aligned with sales.

1976.[10] During a November, 1975 meeting, the Union suggested arrangements for bargaining on the new national agreement. A White-Westinghouse representative stated that he "would get back" to the Union concerning the details of the negotiations and also requested information on local supplement bargaining procedures. *Id.* at 671. In January and February, 1976, the Union, by letter, inquired further about the upcoming bargaining. White-Westinghouse was unresponsive and declined to set a date or to arrange a meeting site.

On March 2, 1976, White-Westinghouse orally informed the Union that it would not bargain on a national multiplant basis. The Company confirmed this by letter three days later and offered to negotiate on a single-plant basis. The Union refused and, upon expiration of the contract on July 11, 1976, the Union employees struck. The undisputed reason for the strike was White-Westinghouse's insistence on single-plant bargaining. The strike continued until October 16, 1976, when the Company and the Union agreed to a contract covering a multiplant unit consisting of all five of the former Westinghouse facilities. This agreement is effective until March 15, 1980 and preserves the Company's right to bargain on a single-plant basis should it prevail in this litigation.

A complaint was issued on July 15, 1976 which alleged that White-Westinghouse violated sections 8(a)(1) and (5) of the Act when it insisted upon single-plant bargaining. An administrative law judge (ALJ) ruled in favor of the complainant. He found that the Union and Westinghouse, by the nature of their previous negotiations, had merged the forty-two separately certified units into a single, multiplant bargaining entity, *id.* at 672, and that the five facilities acquired by White-Westinghouse remained an appropriate bargaining unit, *id.* at 674–75. The ALJ held that the Company, as the successor to Westinghouse, was obliged to engage in multiplant bargaining. *Id.* at 675. The Board adopted the ALJ's opinion and affirmed his ruling. *Id.* at 667. The Board ordered the Company to bargain with the Union on a multiplant basis, to reinstate all striking employees, and to post a notice acknowledging its compliance..

## II

We first determine whether White-Westinghouse succeeded to Westinghouse's multiplant bargaining obligation.[11] The successorship doctrine provides that if employers change, but the bargaining unit remains appropriate, the successor employer is bound to recognize and bargain with the representative of his employees, unless he has a good faith doubt of the union's majority support. *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 281, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The successor is not required to employ his predecessor's workers, although, of course, he may not refuse to hire employees simply because they are union members. *Id.* at 280–81 & n.5, 92 S.Ct. 1571; *see Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 261, 264, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Similarly, the successor is not bound by the predecessor's bargaining agreement and is free to negotiate his own contract. *NLRB v. Burns International Security Service, Inc.,* 406 U.S.

10. The subjects discussed included provisions of various benefits plans, dues check-off arrangements, and military leave procedures.

11. Although each of the forty-two units under Westinghouse was separately certified, negotiation on behalf of the unit employees was always undertaken by the conference board on a national level. As we have explained, *see* note 7 *supra,* the national agreement established virtually all terms and conditions of employment. Local bargaining was limited to subjects of particularly parochial interest.

The Board ruled that this pattern of conduct merged the individually certified units into a single multiplant unit. This finding is consistent with substantial Board precedent holding that parties to collective bargaining relationships may, by contract, bargaining history, and course of conduct, merge existing certified units into multiplant appropriate units. *See, e. g., General Electric Co.,* 180 N.L.R.B. 1094, 1094–95 (1970); *Gould-National Batteries, Inc.,* 150 N.L.R.B. 418, 420 & n.8 (1964); *Owens-Illinois Glass Co.,* 108 N.L.R.B. 947, 949–50 (1954).

at 281–91, 92 S.Ct. 1571. The law of successorship, thus, fosters industrial peace without impeding economic development by balancing the interests of employees who legitimately expect a continuity of bargaining rights against the conflicting needs of employers to freely rearrange newly acquired enterprises. *See Wiley v. Livingston,* 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

A successorship inquiry focuses upon the continuity of the enterprise after the change in ownership. Although the determination is based on the totality of the circumstances [12] and, by nature, is highly fact specific, certain characteristics are usually considered indicative of successorship. These include retention of the predecessor's employees in the same jobs, operation of the same facilities, use of the same supervisors, and manufacture of the same type of product.

The Company contends that it did not succeed to Westinghouse's multiplant bargaining duty because it instituted substantial organizational changes in the appliance division after the transfer of ownership. The Company explains that, upon takeover, the internal organizational emphasis shifted from the corporate-wide, centralized control of Westinghouse to a policy of local autonomy. Each individual facility became an independent profit center, and local personnel began processing appeal level grievances at local, rather than central, sites.

■ We hold that these changes do not preclude finding that White-Westinghouse succeeded to Westinghouse's multiplant bargaining obligation. Although some internal organization alterations may affect successorship obligations, [13] not all changes will be of determinative significance. The essential inquiry is whether operations, as they impinge on union members, remain essentially the same after the transfer of ownership. *See NLRB v. Zayre Corp.,* 424

F.2d 1159, 1162 (5th Cir. 1970), *cited with approval in NLRB v. Burns Security Services, Inc.,* 406 U.S. at 281, 92 S.Ct. 1571. Here the terms of employment, governed by the former Westinghouse agreement and adopted by the Company, continued unchanged. Indeed, the employees were aware of the ownership transfer only upon notification four days after the sale. *White-Westinghouse Corp.,* 229 N.L.R.B. at 670. Further, White-Westinghouse retained the same employees to perform the same duties in the same plants. As the Board explained: "In these circumstances, the alleged change[s] . . . are insufficient to outweigh the overwhelming evidence—and indeed the concession—that [the Company] took over the Westinghouse plants with no significant change in the employing industry." *Id.* at 674; *see Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1141 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1976) (successor's change to localized management "not of such magnitude as to be given controlling effect"); *NLRB v. Interstate 65 Corp.,* 453 F.2d 269, 274 (6th Cir. 1971) (same).

White-Westinghouse proffers two additional grounds upon which it attempts to demonstrate that it did not succeed to a multiplant obligation. White-Westinghouse argues that (1) it cannot be required to bargain with a multiplant unit that has not been certified by the Board, and (2) the diminution in size of the multiplant unit precludes assumption of a multiplant bargaining obligation. The Company rests these contentions on the authority of *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61.

■ White-Westinghouse contends that the *Burns* case recognizes a successor's duty to bargain only with certified representatives of the employees. According to the Company, the "contractual" nature of the multiplant unit under Westinghouse,

---

**12.** *See NLRB v. Boston Needham Indus. Cleaning Co.,* 526 F.2d 74, 77 (1st Cir. 1975).

**13.** *See International Ass'n of Machinists v. NLRB,* 134 U.S.App.D.C. 239, 241–42, 414 F.2d 1135, 1137–38, *cert. denied,* 396 U.S. 889, 90 S.Ct. 174, 24 L.Ed.2d 163 (1969); *NLRB v. Alamo White Truck Service, Inc.,* 273 F.2d 238, 241–42 (5th Cir. 1959).

*see* note 11 *supra*, renders reliance on the successorship doctrine misplaced.[14] Although the facts in *Burns* specifically involved a certified unit, successorship principles are not so limited. It is well settled that bargaining obligations in general do not depend on Board election and certification. 29 U.S.C. § 158(a)(5); *see, e. g., NLRB v. Movie Star, Inc.,* 361 F.2d 346, 351 (5th Cir. 1966); *NLRB v. Greenfield Components Corp.,* 317 F.2d 85, 90 (1st Cir. 1963). The Company does not suggest, nor can we discern, any reason to so condition a successor's duty to bargain with an incumbent union. We therefore hold that a predecessor's voluntary or "contractual" recognition of a unit may be as binding on a successor as that arising from certification. *See Zim's Foodliner, Inc. v. NLRB,* 495 F.2d at 1142. *See also Hess Oil & Chemical Corp. v. NLRB,* 415 F.2d 440, 445 (5th Cir. 1969), *cert. denied sub nom. Oil, Chemical & Atomic Workers International Union v. NLRB,* 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970).

■ White-Westinghouse also argues that the diminution in the size of the multiplant unit from forty-two units to six is a change sufficient to avoid assumption of successorship duties. We disagree. A change in the size of a unit will not by itself defeat successorship obligations as long as the union maintains majority status and the acquired unit remains appropriate. *See, e. g., NLRB v. Band-Age, Inc.,* 534 F.2d 1, 4, 6 (1st Cir. 1976); *NLRB v. Boston Needham Industrial Cleaning Co.,* 526 F.2d 74, 77 (1st Cir. 1975); *Zim's Foodliner, Inc.,* 495 F.2d at 1141–42. Absent any challenge to the Union's status as representative of a majority of the employees, we examine whether the five plants, when severed from the larger Westinghouse multiplant unit, remain an appropriate bargaining unit.

■ At the outset, we emphasize once again our limited power to review Board determinations of appropriate bargaining units.[15] Section 9(b) of the Act, 29 U.S.C. § 159(b) (1976), confers upon the Board broad discretion to select appropriate units, and a Board decision "'is rarely to be disturbed.'" *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers,* 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam) (quoting *Packard Motor Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947)). In reviewing the Board's holding, we may not decide whether other units would be more appropriate. Rather, we must uphold the Board if its decision is rational and in accord with past precedent. *Local 627, Inter-*

14. White-Westinghouse also argues that any party to a contractual or consensual *multiplant* bargaining arrangement, *see* note 11 *supra,* may, upon timely notice, unilaterally insist upon single-plant bargaining. The Company relies upon cases holding that an employer can withdraw from a multi-employer bargaining relationship upon notice rendered prior to the commencement of contract negotiations. *See, e. g., NLRB v. Central Plumbing Co.,* 492 F.2d 1252, 1255 (6th Cir. 1974); *The Evening News Ass'n,* 154 N.L.R.B. 1494, 1495 (1965), *aff'd sub nom. Detroit Newspaper Publishers Ass'n v. NLRB,* 372 F.2d 569, 570 (6th Cir. 1967). The argument misconceives the essential distinction between employer and employee units.

A multi-employer bargaining unit is an arrangement between employers who assign to a common bargaining agent their separate powers to negotiate with a union. The relationship is entirely consensual, *see, e. g., Retail Assoc., Inc.,* 120 N.L.R.B. 388, 393 (1953), and each employer remains a separate bargaining entity who may withdraw from the group in order to negotiate alone.

The relationship between facilities in a multiplant unit is not analogous. Once the Board deems a multiplant unit appropriate, it becomes a *single* bargaining entity. The component parts merge indistinguishably and lose their individual identity. The grouping is not consensual, but rather, within the direct control of the Board. *See* 29 U.S.C. § 159(b) (1976). The unit may be altered only upon mutual agreement of the union and the employer or upon Board order. *See* note 20 *infra.*

15. *See Local 627, Int'l Union of Operating Eng'rs v. NLRB,* 194 U.S.App.D.C. 37, 41–42, 595 F.2d 844, 848–849 (1979); *Wine & Liquor Salesmen Union No. 195 v. NLRB,* 146 U.S. App.D.C. 383, 390, 452 F.2d 1312, 1319 (1971); *NLRB v. Mar Salle, Inc.,* 138 U.S.App.D.C. 135, 138, 425 F.2d 566, 569 (1970); *International Union of Elec. Workers v. NLRB,* 135 U.S.App. D.C. 355, 363, 418 F.2d 1191, 1199 (1969); *Retail Wholesale & Dept. Store Union v. NLRB,* 128 U.S.App.D.C. 41, 45, 385 F.2d 301, 305 (1967).

national Union of Operating Engineers v. NLRB, 194 U.S.App.D.C. 37, 41–42, 595 F.2d 844, 848, 849 (1979).

 The Board assesses the appropriateness of bargaining units by means of the "community of interests" doctrine which groups together employees who have substantial mutual interests in wages, hours, and other conditions of employment. 15 NLRB Annual Report 39 (1950).[16] In this case, the Board found that the employees of the five facilities were a distinct, identifiable entity and that they shared a substantial community of interests. The Board placed particular, although not sole, emphasis on the common bargaining history of the employees.[17] *White-Westinghouse Corp.,* 229 N.L.R.B. at 674. The Board explained that the employees' wages, benefits, and working conditions had all been determined on a group basis. All employees had certain common rights, among them, pension and seniority rights, which remained intact after the ownership change. Labor disputes arising in these, as well as other, areas would have similar impact on all former Westinghouse appliance division employees.[18] Further, all the employees had a national representative in appeal level

grievance proceedings. *White-Westinghouse Corp.,* 229 N.L.R.B. at 674.

 The Board concluded that these mutual interests outweighed any differences[19] now existing among the employees and ruled that the five facilities comprised an appropriate bargaining unit. *Id.* We find, given our limited scope of review, sufficient reasoning to support the Board's determination.[20] Because White-Westinghouse, successor to Westinghouse's multiplant bargaining obligation, refused to bargain with an appropriate multiplant unit, we uphold the Board's ruling that the Company violated sections 8(a)(1) and (5) of the Act by insisting to impasse on single-plant bargaining.[21]

### III

The Board ordered White-Westinghouse to recognize and bargain with the Union on a multiplant basis, to offer immediate and full reinstatement to all striking employees, and to post appropriate notices of compliance. *Id.* at 677. The Union contends that the Board also should have awarded backpay for the three-month period during

---

16. *See Local 627, Int'l Union of Operating Eng'rs v. NLRB,* 194 U.S.App.D.C. at 43–44, 595 F.2d at 850–851; *Libbey-Owens-Ford Co. v. NLRB,* 495 F.2d 1195, 1202–03 (3d Cir.), *cert. denied,* 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974); *Food Store Employees Union Local 347 v. NLRB,* 137 U.S.App.D.C. 248, 252, 422 F.2d 685, 689 (1969).

17. The Board generally considers certain factors in determining whether a single-plant or multiplant unit is appropriate. They are: (1) common control of operations; (2) integration between the plants in products and in personnel matters, such as job classifications and interchange of employees between plants; (3) geographic considerations; and (4) the existing pattern of representation and the history of labor practices. *See Local 627, Int'l Union of Operating Eng'rs v. NLRB,* 194 U.S.App.D.C. at 41 & n.12, 595 F.2d at 848. *See also Local 1325, Retail Clerks Int'l Ass'n v. NLRB,* 134 U.S.App.D.C. 298, 305–06, 414 F.2d 1194, 1201–02 (1969). *See generally* T. Kheel, Labor Law 14.03[3] (1978).

18. The Board suggested that problems might also arise over the termination of the Westing-

house savings plan. *White-Westinghouse Corp.,* 229 N.L.R.B. at 675; *see* note 7 *supra.*

19. The Board particularly noted the geographic separation and lack of interchange of employees. *White-Westinghouse Corp.,* 229 N.L.R.B. at 674; *see* note 5 *supra.*

20. The Board noted that if multiplant bargaining proves unduly burdensome, the Company and the Union may negotiate for unit alteration. If a satisfactory resolution cannot be reached, either party may petition the Board to change the unit. *White-Westinghouse Corp.,* 229 N.L.R.B. at 676; *see Libbey-Owens-Ford Glass Co.,* 169 N.L.R.B. 126 (1968).

21. An employer who bargains to impasse on permissive subjects of bargaining violates section 8(a)(5). *NLRB v. Wooster Div. of Borg-Warner Corp..* 356 U.S. 342, 349–50, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). The scope of a unit is clearly a permissive subject of bargaining. *See Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 159 U.S.App.D.C. 6, 10–11, 486 F.2d 1266, 1268 (1973); *Douds v. International Longshoremen's Ass'n,* 241 F.2d 278, 282–83 (2d Cir. 1957).

which the employees participated in the unfair labor practices strike. The Union argues that without this compensation the remedy is inadequate as well as inconsistent with past Board practice.

▇ Our review of the Board's remedial decisions is extremely limited. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 215–16, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). "In fashioning its remedies . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969).[22] More specifically, the Supreme Court has stated that the power to decide backpay awards " 'is for the Board to wield, not for the courts.' " *NLRB v. J. H. Rutter-Rex Manufacturing Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969) (quoting *NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953)). We may overturn a remedy only if the relief ordered "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.*[23]

▇ The Board's decision in this case accords with the long-standing policy that workers who strike to protest their employer's unfair labor practices are entitled to reinstatement even if they have been replaced.[24] An employer who fails to reinstate an unfair labor practice striker is liable for backpay,[25] from the time that the worker abandons the strike,[26] until the time that the employer offers reinstatement or the striker is actually reinstated.[27] The Board has consistently held, however, that unfair labor practice strikers are not entitled to backpay for the period during which they are striking. *See Comfort, Inc.,* 152 N.L.R.B. 1074, 1090 (1965), *enforcement granted in part and denied in part on other issues sub nom. NLRB v. Comfort, Inc.,* 365 F.2d 867 (8th Cir. 1966); *Baldwin County Electric Membership Corp.,* 145 N.L.R.B. 1316, 1319 (1964); *George W. Ball,* 134 N.L.R.B. 1007, 1009 (1961); *American Manufacturing Co.,* 5 N.L.R.B. 443, 467 (1938).

▇ The Board's policy not to award backpay to unfair labor practice strikers rests upon the assumption that the purposes of the Act are best served by encouraging employees to redress unfair labor practices through administrative process rather than industrial strife. The Board explained in *Comfort, Inc.,* 152 N.L.R.B. at 1080:

> To require the employer to pay backpay for the period of the strike is . . . to "subsidize" the strike. . . . Even if the sole cause of the strike is an unfair labor practice, . . . the Board's machinery should be used to remedy the underlying unfair labor practice without underwriting the strikers' withholding of their labor to effectuate that result.

We do not find, as the Union urges, that the Board's policy which guarantees rein-

---

22. *See Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

23. *Accord, United Steelworkers v. NLRB,* 139 U.S.App.D.C. 146, 148, 430 F.2d 519, 521 (1970) (per curiam); *United Steelworkers Local 5571 v. NLRB,* 130 U.S.App.D.C. 369, 373, 401 F.2d 434, 438 (1968), *cert. denied sub nom. Stanley-Artex Windows, Div. of Stanley Works v. NLRB,* 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969); *Amalgamated Clothing Workers v. NLRB,* 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966).

24. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278 & n.9, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

25. *See NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

26. *See Verlin L. Pulley,* 163 N.L.R.B. 1057, 1064 (1967), *enforcement granted in part and denied in part on other issues sub nom. Verlin L. Pulley v. NLRB,* 395 F.2d 870 (6th. Cir. 1968).

27. *See Louis Page,* 166 N.L.R.B. 629, 631 (1967); *Hilton Mobile Homes,* 155 N.L.R.B. 873, 875–76 (1965), *enforcement granted in part and denied in part on other issues sub nom. NLRB v. Hilton Mobile Homes,* 387 F.2d 7 (8th Cir. 1967).

statement but not backpay to unfair labor practice strikers is arbitrary [28] or frustrates the purposes of the Act. Accordingly, we uphold the Board's order.

## IV

We conclude that the Board properly determined that White-Westinghouse succeeded to a multiplant bargaining obligation and that the five facilities it acquired comprise a single appropriate bargaining unit. White-Westinghouse, by refusing to bargain on this basis, violated sections 8(a)(1) and (5) of the Act. We further conclude that the Board's remedy is adequate and accords with well established policy.

*Enforced and Affirmed.*

---

28. The Board routinely awards backpay to employees who are actually or constructively discharged in violation of section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976). The Union also argues that an unfair labor practice strike is analogous to a constructive discharge and should be governed by similar remedial policies.

The analogy is inapposite. Although both an unfair labor practice strike and a constructive discharge involve work stoppage, the two are not, as the Union contends, conceptual equivalents. As the Board has stated, "there are substantial and real differences between unfair labor practice strikers and employees who have been constructively discharged, which warrant denying backpay to the former but awarding it to the latter." *Waples-Platter Co.,* 49 N.L.R.B. 1156, 1157 (1943).

"A finding of constructive discharge depends on '[whether the employer] made . . . working conditions intolerable and drove [the employee] into an involuntary quit.' " *Retail Store Employees Union Local 880 v. NLRB,* 136 U.S.App.D.C. 27, 30, 419 F.2d 329, 332 (1969)

(quoting *NLRB v. Tennessee Packers, Inc.,* 339 F.2d 203, 204 (6th Cir. 1964)). Although unfair labor practices are always present in constructive discharge cases, not all unfair labor practices will involve conduct so onerous as to warrant a finding of constructive discharge. In this sense, work stoppage in a constructive discharge situation is "involuntary," whereas in a strike, it is "voluntary," tactical action.

Imposition of different remedies reflects the Board's careful balancing of interests covered by the Act. The Board, in an effort to preserve labor harmony, has decided not to award backpay to strikers in order to encourage workers to remain at their jobs and to process complaints through the Board's administrative process. In constructive discharge cases, however, the employer's conduct is so egregious that it would be unfair to deny backpay to employees who are forced to leave. The Board, in its expertise, has the discretion to further labor peace by recognizing the theoretical distinction between an unfair labor practice strike and a constructive discharge.